[898 NE2d 909, 869 NYS2d 866]

LINDA R. GRAEV, Respondent, v LAWRENCE GRAEV, Appellant.

LAWRENCE GRAEV, Appellant, v LINDA R. GRAEV, Respondent.

Argued September 2, 2008; decided October 21, 2008

**POINTS OF COUNSEL**

*Greenberg Traurig, LLP,* New York City (*Leslie D. Corwin, Israel Rubin* and *Rachel Sims* of counsel), for appellant. I. The settlement agreement is a contract subject to principles of contract interpretation. (*Bloomfield v Bloomfield,* 97 NY2d 188; *Matter of Meccico v Meccico,* 76 NY2d 822; *Rainbow v Swisher,* 72 NY2d 106; *Nichols v Nichols,* 306 NY 490; *Slamow v Del Col,* 79 NY2d 1016; *Matter of Scalabrini v Scalabrini,* 242 AD2d 725; *Laba v Carey,* 29 NY2d 302; *Camaiore v Farance,* 50 AD3d 471; *Greenfield v Philles Records,* 98 NY2d 562; *R/S Assoc. v New York Job Dev. Auth.,* 98 NY2d 29.) II. A look at other states that have construed the term "cohabitation" is illustrative. III. By focusing on the sharing of expenses, the Appellate Division majority ignored the way in which cohabiting adults often conduct their exclusive relationships.

*Myrna Felder,* New York City, for respondent. I. The affirmed findings of fact, by which this Court is bound, confirm that there was no cohabitation, even using the dictionary definition of living together in a sexual relationship. (*Matter of Hofbauer,* 47 NY2d 648; *Simon v Electrospace Corp.,* 28 NY2d 136; *L. Smirlock Realty Corp. v Title Guar. Co.,* 63 NY2d 955.) II. Since there was no cohabitation under either definition used by the

Appellate Division majority or dissent, the appeal is hypothetical and moot and should not be considered. (*People ex rel. Arthur F. v Hill,* 29 NY2d 17; *Matter of Grand Jury Subpoenas for Locals 17, 135, 257 & 608 of United Bhd. of Carpenters & Joiners of Am., AFL-CIO,* 72 NY2d 307; *Matter of Roadway Express v Commissioner of N.Y. State Dept. of Labor,* 66 NY2d 742; *Matter of Barbara C.,* 64 NY2d 866.) III. For more than a decade prior to the parties' agreement, right up to the present day, New York courts have uniformly construed the unambiguous plain meaning of cohabitation to require a shared residence, shared household expenses and functioning as an economic unit. (*Scharnweber v Scharnweber,* 105 AD2d 1080, 65 NY2d 1016; *Brown v Brown,* 122 AD2d 762; *Salas v Salas,* 128 AD2d 849; *Matter of Ciardullo v Ciardullo,* 27 AD3d 735; *Clark v Clark,* 33 AD3d 836; *Matter of Emrich v Emrich,* 173 AD2d 818; *Lefkon v Drubin,* 143 AD2d 400; *Markhoff v Markhoff,* 225 AD2d 1000; *Famoso v Famoso,* 267 AD2d 274; *People v Robinson,* 95 NY2d 179.)

*Elliott Scheinberg,* Staten Island, for American Academy of Matrimonial Lawyers, New York Chapter, amicus curiae. I. The *"dum casta"* clause in a settlement agreement contractually terminates spousal maintenance upon the wife's specified cohabitation with an unrelated male. (*Heller v Pope,* 250 NY 132; *Bloomfield v Bloomfield,* 97 NY2d 188; *Matter of Greiff,* 92 NY2d 341; *Christian v Christian,* 42 NY2d 63; *Robinson v Robinson,* 134 Misc 2d 664; *Matter of Embiricos,* 184 Misc 453; *Laba v Carey,* 29 NY2d 302; *Matter of Stoeger,* 30 Misc 2d 1090; *Clark v Clark,* 33 AD3d 836; *Matter of Ciardullo v Ciardullo,* 27 AD3d 735; *Matter of Emrich v Emrich,* 173 AD2d 818; *Scharnweber v Scharnweber,* 105 AD2d 1080, 65 NY2d 1016.) II. The Appellate Division decision created an impermissible presumption in violation of the canon of contract doctrine prohibiting judicial insertions into contracts. (*Rainbow v Swisher,* 72 NY2d 106; *Matter of Boden v Boden,* 42 NY2d 210; *Matter of Meccico v Meccico,* 76 NY2d 822; *Schmelzel v Schmelzel,* 287 NY 21; *Braithwaite v Braithwaite,* 299 AD2d 383; *Matisoff v Dobi,* 90 NY2d 127; *Brady v Nally,* 151 NY 258; *Mencher v Weiss,* 306 NY 1; *Fox Film Corp. v Springer,* 273 NY 434; *Nichols v Nichols,* 306 NY 490.) III. Words in a contract are to be given their ordinary dictionary meanings. (*Mazzola v County of Suffolk,* 143 AD2d 734; *2619 Realty v Fidelity & Guar. Ins. Co.,* 303 AD2d 299, 100 NY2d 508; *Scharnweber v Scharnweber,* 65 NY2d 1016.) IV. "Natural, ordinary, familiar meanings" of words and "apparent meaning may not be distorted," and "reasonable implications

expectations" and "evident intent" must be followed as written. (*Rainbow v Swisher,* 72 NY2d 106; *Matter of Boden v Boden,* 42 NY2d 210; *Matter of Meccico v Meccico,* 76 NY2d 822; *Schmelzel v Schmelzel,* 287 NY 21; *Robinson v Robinson,* 134 Misc 2d 664; *Matter of Embiricos,* 184 Misc 453; *Matter of Stoeger,* 30 Misc 2d 1090; *Kalousdian v Kalousdian,* 35 AD3d 669; *Slatt v Slatt,* 102 AD2d 475; *Blackmon v Estate of Battcock,* 78 NY2d 735.) V. Another canon of contract construction directs that strict and rigid meanings may not be given to words; the Appellate Division decision imputed a rigid meaning of "cohabitation" to counsel. (*Atwater & Co. v Panama R.R. Co.,* 246 NY 519.) VI. The Appellate Division decision applies a one-size-fits-all reasoning even in instances where fact and logic dictate otherwise; conflicts and unanswered questions persist within the Appellate Division decision. (*Famoso v Famoso,* 267 AD2d 274; *Lefkon v Drubin,* 143 AD2d 400; *Matter of Emrich v Emrich,* 173 AD2d 818.)

*McCarthy Fingar LLP,* White Plains (*Gail M. Boggio* of counsel), for Women's Bar Association of the State of New York, amicus curiae. I. The term cohabitation has been uniformly construed throughout New York State. (*Scharnweber v Scharnweber,* 105 AD2d 1080, 65 NY2d 1016; *Brown v Brown,* 122 AD2d 762; *Salas v Salas,* 128 AD2d 849; *Clark v Clark,* 33 AD3d 836; *Matter of Emrich v Emrich,* 173 AD2d 818; *Matter of Ciardullo v Ciardullo,* 27 AD3d 735; *Lefkon v Drubin,* 143 AD2d 400.) II. Women who signed agreements over the course of the last 20 years are entitled to rely upon the uniform case law definition of cohabitation. (*Scharnweber v Scharnweber,* 105 AD2d 1080, 65 NY2d 1016; *People v Robinson,* 95 NY2d 179; *Famoso v Famoso,* 267 AD2d 274; *Matter of Emrich v Emrich,* 173 AD2d 818; *Lefkon v Drubin,* 143 AD2d 400; *Salas v Salas,* 128 AD2d 849.) III. The dictionary test propounded by appellant would have an immense negative effect on dependent spouses. (*Hartog v Hartog,* 85 NY2d 36.)

### OPINION OF THE COURT

READ, J.

In 1995, Linda Graev and Lawrence Graev filed separate divorce actions, which were subsequently consolidated. On April 18, 1997, they entered into a settlement agreement that was incorporated, but not merged, into a judgment of divorce entered and filed in June 1997. As relevant to this appeal, the agreement required Mr. Graev to pay Mrs. Graev spousal support payments in the amount of $10,000 per month, subject to a

specified maximum cost-of-living adjustment, until the earlier of August 10, 2009 or the occurrence of any of four "termination events"; namely, the wife's remarriage or death, the husband's death, or "[t]he cohabitation of the Wife with an unrelated adult for a period of sixty (60) substantially consecutive days." The agreement did not define "cohabitation."

On September 7, 2004, Mr. Graev advised Mrs. Graev that her cohabitation with MP, an unrelated adult male, had been "documented and photographed by professionals retained by [his] counsel." Invoking the settlement agreement's provision for termination in the event of cohabitation, Mr. Graev therefore ceased making spousal support payments as of September 2004.

On October 13, 2004, Mrs. Graev moved in Supreme Court by order to show cause to enforce the settlement agreement's maintenance provisions; on October 29, 2004, Mr. Graev cross-moved for summary judgment on the ground that a termination event had occurred. Mr. Graev essentially took the position that Mrs. Graev and MP were cohabiting within the meaning of the settlement agreement because MP had stayed overnight in Mrs. Graev's vacation home in Connecticut for at least 60 substantially consecutive days during the summer of 2004, as borne out by surveillance. Further, he contended, there was an "obvious serious relationship" between Mrs. Graev and MP, and MP was Mrs. Graev's "lover and life partner," as illustrated by the number of family occasions—weddings, birthdays and the like— they attended as a couple.

Mrs. Graev argued that she did not "cohabit" with MP during the summer of 2004 because their relationship had long been platonic, as proven by evidence of MP's sexual incapacity and her diminished sexual desire caused by prescribed medication. In Mrs. Graev's view, "use [of] the word 'cohabitation'— rather than 'living together' or 'residing' . . . plainly mean[t] having sexual relations." In response, Mr. Graev insisted that "cohabitation could not possibly require 'sexual relations' " under the law and the plain meaning of the settlement agreement, which was intended to be less stringent than section 248 of the Domestic Relations Law.[1]

In subsequent dueling submissions to the motion court, Mrs. Graev for the first time pointed to "a body of New York cases

---

1. This provision vests trial judges with discretion to annul support payments "upon proof that the wife is habitually living with another man *and* holding herself out as his wife" (Domestic Relations Law § 248 [emphasis added]).

where termination of maintenance was not permitted [where] there was no economic unit shown." For his part, Mr. Graev reprised his argument that "cohabitation [was] not synonymous with, and [did] not require a showing of 'sexual relations,' " but rather encompassed a "variety of factors," none of which was dispositive.

On February 14, 2005, Supreme Court granted both parties' motions to the extent of ordering a hearing to determine whether Mrs. Graev's relationship with MP constituted "cohabitation" within the meaning of the settlement agreement. The motion court first acknowledged that "the parties['] agreement relating to 'cohabitation' draws from, but is far more expansive than, the language found in section 248 of the Domestic Relations Law" (6 Misc 3d 1024[A], 2005 NY Slip Op 50169[U], *2). Next, the court stated that whether Mrs. Graev was having sexual intercourse with MP was "not conclusive." (*Id.*) Rather, "sexual intimacy may be one of the elements that a court could consider." (*Id.*)

Given the absence of a definition of "cohabitation" in the settlement agreement, Supreme Court determined that "the plain meaning of" the word should be examined, as well as various New York cases, none of which "narrowly construed 'cohabitation' in the manner [Mrs. Graev] suggest[ed]." (*Id.*) The motion court opined that "cohabitation consist[ed] of several elements that [Mr. Graev] must establish by a preponderance of the evidence at a hearing," but did not identify or suggest how much weight to give any individual element (*id.* at *3). The court twice cited *Brown v Brown* (122 AD2d 762, 763, 764 [2d Dept 1986]), which held that the ex-wife was not "liv[ing] with another man" so as to forfeit her support payments under the terms of a stipulation where "the evidence did not establish that [she] and her tenant shared household expenses or a bedroom, or that they functioned as an economic unit." The court also adverted to *Matter of Watson v Watson* (39 AD2d 660 [1st Dept 1972] [intermittent intimacy with the same male does not fulfill the requirements of Domestic Relations Law § 248]); *Olstein v Olstein* (309 AD2d 697, 698, 699 [1st Dept 2003] [ex-wife "resid(ed) . . . with a non-relative adult male . . . for a reasonably continuous period of more than six months" where she admitted to a "romantic" relationship with her male friend, and they shared meals and stayed overnight in the same house for requisite period of time]); *Famoso v Famoso* (267 AD2d 274, 274, 275 [2d Dept 1999] [ex-wife did not "resid(e) with an unre-

lated adult male . . . for a period of 120 days in any one (1) year" where "resid(e)" was defined in separation agreement as "staying overnight" because husband neither established that ex-wife's male friend stayed overnight a sufficient number of times during surveillance period, nor, alternatively, actually resided with her in light of evidence that he maintained a separate residence]); *Markhoff v Markhoff* (225 AD2d 1000 [3d Dept 1996] [applying Domestic Relations Law § 248]); and *Scharnweber v Scharnweber* (105 AD2d 1080 [4th Dept 1984] [concluding that ex-wife was not "living" with an unrelated male at the former marital residence where "the evidence established that they (did) not share household expenses or a bedroom and (did) not function as an economic unit"], *affd* 65 NY2d 1016, 1017 [1985] [holding that a separation agreement may condition a husband's obligation to support ex-wife "solely on her refraining from living with another man without the necessity for the husband to also prove that she habitually holds herself out as the other man's wife as Domestic Relations Law § 248 requires"]).

The hearing was held before another Supreme Court Justice. Contending for the first time that the word "cohabitation" was ambiguous, Mr. Graev moved in limine for permission to present extrinsic evidence of the "circumstances surrounding the [settlement] agreement" so as to explain what behavior the parties intended to cover. Mrs. Graev countered that the motion court "was able to define the term cohabitation in accordance with the plain meaning of the term as construed by the case law" cited in its decision (i.e., *Brown, Olstein, Famoso, Markhoff* and *Scharnweber*), thus "removing any question of ambiguity" and establishing the law of the case.

Supreme Court denied the motion on the ground that the motion court's February 2005 decision held that the word "cohabitation" as used in the settlement agreement was not ambiguous.[2] By the conclusion of the ensuing trial, Mr. Graev was arguing that Mrs. Graev and MP were cohabiting within the meaning of the settlement agreement because they consistently shared a bed at her summer home in Connecticut during the summer months of 2004; their relationship was, at least at one

---

**2.** As the majority in the Appellate Division subsequently noted, however, the motion court's ruling "did not explicitly state that the term 'cohabitation' was unambiguous, but instead that the term had not been construed in the narrow manner that Mrs. Graev suggested" initially; i.e., having sexual relations (*Graev v Graev*, 46 AD3d 445, 447 [1st Dept 2007]).

point, admittedly sexual[3] and remained romantic and exclusive for over three years; they participated in social activities with friends and family as a couple and split costs when dating; and they performed chores and errands together. These facts were basically undisputed. For her part, Mrs. Graev contended that she and MP were *not* "cohabiting" within the meaning of the settlement agreement because the cases relied on by the motion court "define[d] cohabitation as living together[,] with the central element being the maintaining [of] one residence, sharing household expenses and functioning as an economic unit." And in this case, it was undisputed that MP owned his own home in Connecticut, where he spent considerable time, and did not contribute to the costs of maintaining Mrs. Graev's summer home.

In a decision and order dated March 10, 2006, Supreme Court, again relying on the motion court's decision, opined that because "cohabitation" was not defined in the settlement agreement, she had to consider its plain meaning and those few New York cases construing similar termination clauses. She referred to Black's Law Dictionary, which defines "cohabitation" to mean "living together, esp[ecially] as partners in life, usu[ally] with the suggestion of sexual relations" (Black's Law Dictionary 277 [8th ed 2004]), but noted that, as the motion court had ruled, "sexual intimacy alone [was] not determinative of . . . cohabitation." In any event, Supreme Court credited Mrs. Graev's and MP's testimony that their relationship ceased to be sexual long before the summer of 2004.

Citing *Markhoff* and *Matter of Emrich v Emrich* (173 AD2d 818 [2d Dept 1991]), Supreme Court concluded that New York cases "find that an essential element of cohabitation is a shared residence with shared household expenses" and that "the couple functioned as an economic unit," features lacking in the bond between Mrs. Graev and MP, which she likened to "an adult dating relationship." As already mentioned, *Markhoff* applied Domestic Relations Law § 248. In *Emrich,* the Appellate Division concluded that the ex-wife was not "residing on a substantially continuous basis" with another male (meaning "for a period not less than sixty [60] days") because of "the evidence that the wife's [male] friend maintained a separate residence and that his contributions to the wife's household expenses were sporadic and minor" (*Emrich,* 173 AD2d at 819, 820).

---

**3.** According to Mrs. Graev and MP, they started dating in October 2002, but were sexually intimate only from January to March 2003.

On appeal, Mr. Graev repeated his plea that the word "cohabitation" is ambiguous under New York law. Mrs. Graev rejoined that New York courts have construed "cohabitation" as synonymous with "living together," which, in turn, the courts have long held to mean sharing a residence, sharing expenses, and functioning as an economic unit. The Appellate Division affirmed, with two Justices dissenting.

The majority acknowledged that parties to a divorce can, by agreement, alter the terms that would otherwise apply under Domestic Relations Law § 248, and observed that these kinds of agreements are "contracts subject to the principles of contract construction and interpretation" (*Graev*, 46 AD3d at 450). The majority then concluded that

> "[a] review of New York case law shows that in the context of these types of separation agreements, *the term cohabitation has a plain meaning which contemplates changed economic circumstances, and is not ambiguous. . . .* [I]t is . . . sensible to presume that attorneys using a term such as 'cohabitation' in a separation agreement are aware of the judicial decisions construing the term" (*id.* at 451 [emphasis added]).

According to the majority, New York judicial decisions had consistently interpreted "cohabitation" to mean "more than a romantic relationship or series of nights spent together" and to require "the sharing of finances" or "an economic relationship akin to a shared possessory interest in one home," which could be "proven with evidence that two people keep their personal belongings and receive their mail at the same address" (*id.* at 452, citing *Salas v Salas*, 128 AD2d 849 [2d Dept 1987], *lv dismissed* 70 NY2d 747 [1987] [ex-wife was not "living together" with another man because they maintained separate residences, frequently slept in their separate residences, and did not share household expenses or otherwise function as an economic unit]). The majority adduced four cases to support this proposition: *Scharnweber*; *Emrich*; *Matter of Ciardullo v Ciardullo* (27 AD3d 735, 736 [2d Dept 2006] [concluding that ex-wife was not "habitually living with a man" or "establish-(ing) a residence with a man" because unrebutted evidence showed that her boyfriend "maintained a separate residence in the one-bedroom apartment he rented from (her) and the two did not share household expenses or function as an economic unit"]); and *Clark v Clark* (33 AD3d 836, 837, 838 [2d Dept

2006] [interpreting "cohabitation of the Wife with an unrelated male," and citing *Ciardullo, Emrich* and *Scharnweber* for the principle that "(a)s interpreted by New York courts, the term cohabitation entails a relationship between a former wife and an unrelated male who live together in the same residence and share household expenses or function as an economic unit" (internal quotation marks omitted)]).

As for this case, the majority found that Mrs. Graev and MP spent more than 60 substantially consecutive nights together during the summer of 2004, and that "their relationship became romantic in January 2003" (*Graev*, 46 AD3d at 448). These facts were not "decisive" under New York case law, however, because MP owned his own home and there was "absolutely no evidence that the couple shared household expenses or functioned as a single economic unit" (*id.* at 453). As a result, the majority concluded that Mrs. Graev's relationship with MP did not amount to "cohabitation."

The dissent would have awarded Mr. Graev summary judgment terminating his obligation to make spousal support payments. Setting out various dictionary definitions for "cohabitation," the dissent considered it "obvious" that "in the context of the agreement, cohabitation mean[t] living together in a sexual relationship for a period of 60 substantially consecutive days" (*id.* at 458), and disbelieved Mrs. Graev's and MP's testimony about the absence of sexual intimacy in their romantic relationship after March 2003. The dissent did not "take the position that financial interdependence [was] irrelevant," but "merely state[d] that under the terms of this agreement, it [was] not determinative of the issue of cohabitation, as the majority holds" (*id.* at 459).

We now reverse. We do not agree that "the term cohabitation has a plain meaning which contemplates changed economic circumstances, and is not ambiguous" absent an explicit provision to the contrary in a separation agreement or stipulation (*Graev*, 46 AD3d at 451), or, put slightly differently, is necessarily determined by whether a "couple share[s] household expenses or function[s] as a single economic unit" (*id.* at 453). Rather, the word "cohabitation" is ambiguous as used in this settlement agreement: neither the dictionary nor New York case law supplies an authoritative or "plain" meaning. Similarly, courts in other states have not ascribed a uniform meaning to the word "cohabitation" as used in separation agreements (*see* Allen, Annotation, *Divorced or Separated Spouse's Living with*

*Member of Opposite Sex as Affecting Other Spouse's Obligation of Alimony or Support Under Separation Agreement*, 47 ALR4th 38, §§ 6[a], 6[b]).

In addition to the definition in Black's Law Dictionary, already set out, "cohabit" is variously defined as "[t]o live together as husband and wife: often said distinctively of persons not legally married" (3 Oxford English Dictionary 448 [2d ed 1989]); "live together and have a sexual relationship without being married" (The New Oxford American Dictionary 330 [2d ed 2005]); "to live together as or as if as husband and wife" (Webster's Third New International Dictionary 440 [2002 ed]); "to live together as husband and wife, usually without legal or religious sanction," or "to live together in an intimate relationship" (Random House Webster's Unabridged Dictionary 400 [2d ed 2001]); and "to live together as or as if a married couple" (Merriam Webster's Collegiate Dictionary [10th ed 1997]). The common element in all these definitions is "to live together," particularly in a relationship or manner resembling or suggestive of marriage, and New York courts have, in fact, used the word "cohabitation" interchangeably with the phrase "living together" (*see e.g. Markhoff*, 225 AD2d at 1001; *Olstein*, 309 AD2d at 698; *Scharnweber*, 65 NY2d at 1017). Ultimately, however, "living together" as if husband and wife is no less opaque than "cohabitation": both bring to mind a variety of physical, emotional and material factors, and therefore might mean any number of things in a separation agreement, where otherwise unexplained in the text, depending on the parties' intent. For example, the parties here might reasonably have meant "cohabitation" to encompass whether Mrs. Graev engaged in sexual relations with an unrelated adult; whether she and the unrelated adult commingled their finances or—just the opposite—whether she supported the unrelated adult financially; whether she and the unrelated adult shared the same bed; or some combination of these or other factors associated with living together as if husband and wife.

Nor does New York case law establish a distinct meaning—"changed economic circumstances"—for "cohabitation." The argument that it does stems from the Appellate Division's one-paragraph, frequently cited decision in *Scharnweber*, which we affirmed. In that case, Supreme Court concluded that an unrelated male was living with Mrs. Scharnweber in the former marital residence, which entitled her ex-husband to cease support payments and required her to pay $10,000 to discharge a

second mortgage. There are no facts recited in the Appellate Division's decision. The record on appeal, however, discloses that Mrs. Scharnweber, who was 43 years old, was having an affair with her daughter's former boyfriend, who was 24 years old. The boyfriend moved into a house 300 yards down the street from the former marital residence, first house-sitting for the absent owner and subsequently renting a room. He gave Mrs. Scharnweber or her teenage daughter (the cook in the family) money to purchase food, and routinely took his meals with Mrs. Scharnweber and her children at the former marital residence; he also occasionally helped her out with car payments. Both Mrs. Scharnweber and her boyfriend testified that he did not sleep overnight with her in the marital residence (he worked a night shift; she worked during the day).

The Appellate Division reversed, concluding that "the evidence established that [Mrs. Scharnweber and her boyfriend did] not share household expenses or a bedroom and [did] not function as an economic unit" despite the boyfriend's financial contributions for food and transportation (*Scharnweber*, 105 AD2d at 1080). In our memorandum decision, we stated that the facts in the case, which we did not describe, "more nearly comport[ed] with the Appellate Division's view" than with Supreme Court's, and so the ex-husband "failed to establish the cohabitation required by the agreement" (*Scharnweber*, 65 NY2d at 1017). We did not equate the word "cohabitation" with "changed economic circumstances" alone. Indeed, the Appellate Division in *Scharnweber* indicated that whether Mrs. Scharnweber and her boyfriend *shared a bedroom* (unlike Mrs. Graev and MP, they did not) was also a relevant factor (*see also Brown*, 122 AD2d at 764). While more recent Appellate Division decisions— particularly *Ciardullo* and *Clark*—may be read to imply, as the Appellate Division held in this case, that there can be no "cohabitation" without changed economic circumstances, we have never taken this position and decline to do so now. In addition, as Mr. Graev points out, *Ciardullo* and *Clark* were handed down long after the drafters of the settlement agreement in this case had finished their work, and so could not have influenced it.

The ambiguity of the word "cohabitation" in this settlement agreement is illustrated by the shape-shifting "plain" meanings and positions advanced by the parties over the course of the litigation. Initially, Mr. Graev claimed that Mrs. Graev and MP were cohabiting because MP stayed overnight in Mrs. Graev's house for 60 substantially consecutive days, and shared a close

social, familial-like relationship. Mrs. Graev objected that "cohabitation" did *not* mean "living together," and "plainly" meant only "having sexual relations."

After the motion court ruled that "cohabitation" encompassed many different elements, and not just sexual intimacy, Mr. Graev argued that the word "cohabitation" was, in fact, ambiguous, and therefore extrinsic evidence was required to flesh out its meaning for these parties. Mrs. Graev then tacked about, contending that "cohabitation" was, after all, synonymous with "living together," and that the "plain meaning of [cohabitation] as construed by the case law" entailed a shared residence, shared household expenses and living together as an economic unit. Having won below on this basis, Mrs. Graev makes the same assertions here. For his part, Mr. Graev insists—in line with the dissent in the Appellate Division—that "cohabitation" plainly contemplates solely a series of 60 more-or-less consecutive nights spent together.

In short, the word "cohabitation" does not have a "plain" meaning in this settlement agreement. Without extrinsic evidence as to the parties' intent, there is no way to assess the particular factors inherent in the dictionary meanings or case law discussions of "cohabitation" the parties may have meant to embrace or emphasize.[4]

Accordingly, the order of the Appellate Division should be reversed, without costs, and the case remitted to Supreme Court for further proceedings in accordance with this opinion.

GRAFFEO, J. (dissenting). The issue in this case is whether the proof of "cohabitation" submitted by Mr. Graev was adequate to discontinue his maintenance obligation under the cohabitation clause in the parties' agreement. I conclude it was and, therefore, would hold, as matter of law, that Mr. Graev is entitled to terminate his maintenance payments. The majority,

---

4. The dissent complains that our resolution of this appeal "creates uncertainty, making it difficult for parties to understand their obligations and responsibilities"; and that "[t]he wiser choice is to articulate a clear rule of law" (dissenting op at 280). But the uncertainty stems principally from parties' use of a word sufficiently ambiguous to have been interpreted so variously by the courts. Moreover, the dissent's purportedly "clear rule of law" is hardly fair to those who may have used the word "cohabitation" in an extant separation agreement, intending the meaning ascribed to it by those Appellate Division cases requiring financial interdependence. The wisest rule, of course, is for parties in the future to make their intention clear by more careful drafting.

however, views the use of the term "cohabitation" in the divorce settlement agreement in this case as inherently ambiguous and requires a court to make findings of fact regarding what the parties intended the term to mean. Because the cohabitation provision includes a specific time period together with the maintenance termination event, I believe the clause is unambiguous and there is no need to remit this case to Supreme Court for yet another hearing.

## I

After two years of contentious divorce litigation, the Graevs negotiated a settlement agreement, which was incorporated, but not merged, in the judgment of divorce entered in June 1997. According to the terms of the negotiated settlement, Lawrence Graev paid Linda Graev almost $2.5 million and agreed to make maintenance payments of $120,000 a year (later increased to $132,000 a year), with monthly maintenance payments continuing until August 10, 2009—about 12 years after the parties' divorce. These payments would terminate upon the occurrence of one of four specified events: (1) the death of Mrs. Graev; (2) the death of Mr. Graev; (3) Mrs. Graev's remarriage; or (4) Mrs. Graev's "cohabitation . . . with an unrelated adult for a period of sixty (60) substantially consecutive days."[1]

Linda Graev's primary residence was an apartment on Fifth Avenue in New York City, but she also maintained a home in Connecticut that she used intermittently and for about two months every summer. Sometime after the divorce, she became acquainted with M.P., who owned a home near hers in Connecticut. They soon began an exclusive and intimate relationship. It is undisputed that M.P. and Mrs. Graev spent virtually every day and night together for over 60 days from June through August 2004. M.P. had unfettered access to her home, but he did not keep much personal property at Mrs. Graev's house (with the exception of an approximately two-week period after he sold his home and before he purchased a new house). Each paid for their own expenses and their finances were not commingled. Despite M.P.'s daily use of Mrs. Graev's home, he did not make contributions toward upkeep of the property. As Mrs. Graev's

---

**1.** The agreement here did not incorporate the entire statutory standard set forth in Domestic Relations Law § 248 for termination of court-ordered support. Section 248 allows a court, upon application, to exercise discretion "upon proof that the wife is habitually living with another man and holding herself out as his wife, although not married to such man."

constant companion, M.P. began attending Graev family functions, such as birthday and college graduation celebrations. In fact, when M.P. attended the Graevs' daughter's wedding ceremony, he joined in the formal family photographs that were taken to commemorate that occasion.

After receiving reports from investigators regarding M.P.'s consistent presence at his ex-wife's home, Lawrence Graev moved to terminate his maintenance obligation on the ground that Linda Graev had cohabitated with M.P. during the summer of 2004. She countered that she had not triggered a spousal support termination event because M.P. owned a home and their finances remained separate. Both Supreme Court and the Appellate Division concluded that there was no cohabitation under the meaning of the parties' divorce agreement because Mrs. Graev and M.P. did not function as a single "economic unit." Mr. Graev now appeals to this Court as of right on the basis of a two-Justice dissent in the Appellate Division that would have granted his application on the rationale that financial interdependence is not a prerequisite to cohabitation.

## II

"A separation agreement is a contract subject to the principles of contract construction and interpretation" (*Matter of Meccico v Meccico*, 76 NY2d 822, 823-824 [1990]). It is an elementary rule that contracts are construed in accordance with the intent of the parties and the best evidence of the parties' intent is what they write in their agreement (*see e.g. Goldman v White Plains Ctr. for Nursing Care, LLC*, 11 NY3d 173, 176 [2008]). Consequently, if a written agreement is complete, clear and unambiguous, it " 'must be enforced according to the plain meaning of its terms,' without reference to extrinsic materials outside the four corners of the document" (*id.*, quoting *Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]). When presented with such an agreement, "a court is not free to alter the contract to reflect its personal notions of fairness and equity" (*Greenfield v Philles Records*, 98 NY2d at 570).

Contrary to the majority's assertion, I find that the term "cohabitation" has a commonly-accepted core meaning: habitually living with an unrelated adult in the same residence while engaged in an intimate relationship without being legally married to that person (*see e.g.* Black's Law Dictionary 277 [8th ed] ["The fact or state of living together, esp. as partners in life,

usu. with the suggestion of sexual relations"]; New Oxford American Dictionary 330 [2d ed 2005] ["live together and have a sexual relationship without being married"]; Random House Webster's Unabridged Dictionary 400 [2d ed 2001] ["1. to live together as husband and wife, usually without legal or religious sanction. 2. to live together in an intimate relationship"]; Webster's Third New International Dictionary 440 [2002 ed] ["to live together as or as if as husband and wife"]). In fact, we have explained that "cohabitation" is synonymous with the phrase "habitually living with another" person for purposes of the maintenance termination provisions of Domestic Relations Law § 248 (*see e.g. Matter of Bliss v Bliss*, 66 NY2d 382, 389 [1985] ["statutory language clearly mandates discrete findings of *cohabitation* and holding out" (emphasis added)]; *Northrup v Northrup*, 43 NY2d 566, 571 [1978]; *see also Markhoff v Markhoff*, 225 AD2d 1000, 1001 [3d Dept 1996], *lv denied* 88 NY2d 807 [1996]; *Gordon v Gordon*, 342 Md 294, 297 n 2, 675 A2d 540, 542 n 2 [1996]; *E.D.M. v T.A.M.*, 307 SC 471, 475, 415 SE2d 812, 815 [1992] ["evidence of living together in an intimate relationship supports a finding of cohabitation"]).

It is true, however, that the use of the term "cohabitation" without elaboration or conditions is capable of causing ambiguity. This is because a living arrangement becomes cohabitation only if it is habitual and this requirement may not be quantified in every situation. But the parties in this case were careful to avoid this pitfall by indicating that the benchmark would be a specific duration—"sixty (60) substantially consecutive days"—a practice that is implicitly recommended by a leading New York treatise (*see* Scheinkman, New York Law of Domestic Relations, Appendix B, at 550 [12 West's NY Prac Series] ["openly and continuously cohabits with an unrelated male for a continuous period exceeding 30 days"]). This was sufficient to make the cohabitation clause here unambiguous.[2]

The Graevs agreed that maintenance payments would terminate if Linda Graev cohabitated for 60 or more substantially consecutive days with a person not related to her. As Mrs. Graev concedes, she and M.P. were in an intimate relationship: they held themselves out as a couple to their family, friends and

---

2. Although it has been said that "cohabitation," standing alone, is ambiguous because it can mean to live with a man, a woman, or either a man or a woman (*Kripp v Kripp*, 578 Pa 82, 92-93, 849 A2d 1159, 1165 [2004]), even if that is true the divorce agreement in this case specified that Mrs. Graev would not live with an unrelated "adult."

community; their approximately three-year relationship was exclusive, monogamous and, at least for a time, sexual in nature; M.P. attended family celebrations; he had complete access to her home; they spent most of their time together; and they slept together almost every night for at least 60 substantially consecutive days. Consequently, I would hold that Mrs. Graev cohabitated with M.P. for the requisite period of time, resulting in the termination of her right to continued maintenance.

## III

The fact that Mrs. Graev and M.P. lived together intimately for the relevant time frame but did not share household expenses or "function as an economic unit"—the key component of the Appellate Division's reasoning—does not provide an adequate basis for departing from the text of this divorce agreement and basic principles of contract law. To begin, in construing the term "cohabitation," we have never suggested that two people cannot "live together" in an intimate relationship if they do not function as an "economic unit" (*see e.g. Matter of Bliss v Bliss*, 66 NY2d at 389; *Northrup v Northrup*, 43 NY2d at 571). Admittedly, there is a line of Appellate Division cases that supports the idea that cohabitation requires financial interdependence. The genesis of this analysis appears to have been *Scharnweber v Scharnweber* (105 AD2d 1080 [4th Dept 1984], *affd* 65 NY2d 1016 [1985]). The agreement in that case specified that the ex-wife would "not have any unrelated male living in the household" that was the former marital residence. The Appellate Division concluded that this condition had not been met because the ex-wife and the new man did "not share household expenses or a bedroom and d[id] not function as an economic unit" (*id.*).

This Court affirmed, noting only that the evidence failed to establish that "the wife lived with an unrelated male at the former marital residence" (65 NY2d at 1017). Significantly, we did not address or endorse the "economic unit" requirement. Nevertheless, courts have subsequently adopted the notion that cohabitation requires a sharing of household expenses or functioning as an economic unit without adequately explaining why this factor must be engrafted on divorce agreements and stipulations that do not incorporate such a condition (*see e.g. Clark v Clark*, 33 AD3d 836 [2d Dept 2006]; *Matter of Ciardullo v Ciardullo*, 27 AD3d 735 [2d Dept 2006]).

Today, as a Court, we unanimously reject the rule that economic interdependence is a sine qua non of cohabitation.[3] Aside from the textual and contractual considerations, that rule makes little sense practically because a party receiving maintenance can easily evade the consequence of a termination provision and receive more than the benefit of his or her bargain. Mrs. Graev and M.P., for example, would be free to continue their relationship in its current form indefinitely without violating the termination provision—they could be together 24 hours a day and sleep together every night for years—but as long as they maintain separate bank accounts and do not share expenses, they would not be cohabitating under the economic unit concept. This is not how a cohabitation clause is supposed to work; nor is it what other parties anticipate when including similar cohabitation clauses in their agreements.

That being said, I agree with the majority that economic interdependence can be relevant to the cohabitation analysis. As the plain meaning of the term makes clear, cohabitation is comprised of several distinct elements: (1) living with (2) an unrelated adult (3) for a specified period of time or with an expectation of permanence (4) in an intimate relationship (5) without being married to that person. In my view, the extent to which a couple intermingles its finances is pertinent on the issues of whether the relationship is sufficiently "intimate" or whether the parties intended a long-term commitment. But in this case, the intimate nature of the relationship is not in dispute, and the question of duration or permanence is addressed by the agreement itself—60 substantially consecutive days. Hence, the cohabitation clause has been triggered.

The Appellate Divisions' "economic unit" theory is also undermined by its failure to take into account that financial independence, as well as economic interdependence, may sometimes support a finding of cohabitation. This is so because there can be more than one purpose for a cohabitation clause. It can represent the parties' understanding that one ex-spouse should

---

**3.** The essential holding of the majority's opinion is that there can be cohabitation without financial interdependence or functioning as an economic unit (*see* majority op at 273 [recognizing the existence of the Appellate Divisions' "economic unit" theory but stating that "we have never taken this position and decline to do so" in this case]).

not have to pay maintenance if the other has a new partner to help support his or her lifestyle. But, just as importantly, these clauses may also be designed to prevent an ex-spouse from using the money he or she receives from an ex-spouse to support a new paramour.[4]

## IV

In sum, the majority's determination that the use of "cohabitation" in divorce agreements gives rise to ambiguity raises serious concerns. First, it will create a proliferation of litigation in virtually every case where these commonly-used cohabitation/maintenance termination provisions are sought to be enforced. And courts, in turn, will have little helpful evidence when attempting to evaluate the issue other than the self-interested testimony of the parties themselves.[5] Second, requiring extrinsic evidence in all these cases undermines the primary purpose for entering into written agreements—to memorialize the parties' understanding of the parameters of permissible and impermissible conduct and personal relations. Thus, the majority's rule creates uncertainty, making it difficult for parties to understand their obligations and responsibilities. The wiser choice is to articulate a clear rule of law: cohabitation occurs when two unrelated adults who are not married to each other have an intimate relationship and live together habitually for an agreed-to period of time.

For all of these reasons, I conclude that the maintenance obligation was terminated by operation of the cohabitation

---

4. *See e.g. Gordon v Gordon*, 342 Md at 309-310, 675 A2d at 548 ("if the cohabitant does not pay a fair share of the household expenses, then it follows that part of the support payment supports the cohabitant rather than the ex-spouse"); *Wolfe v Wolfe*, 46 Ohio St 2d 399, 421, 350 NE2d 413, 427 (1976) (" 'if the paramour resides in the wife's home without contributing anything toward the purchase of food or the payment of normal household bills, then there may be a reasonable inference that the wife's alimony is being used, at least in part, for the benefit of the paramour, in which case it could be argued with force that the amount thereof should be modified accordingly' "), quoting *Garlinger v Garlinger*, 137 NJ Super 56, 64, 347 A2d 799, 803 (1975).

5. Parties to future divorce agreements may wish to consider whether to define "cohabitation" to expressly exclude the "economic unit" concept (*see generally Zipparo v Zipparo*, 70 AD2d 616 [2d Dept 1979] [defining term to mean " 'the regular living together of the Wife with a man for period exceeding six (6) months' "]) or simply discontinue using the term "cohabitation"—which the majority believes is inherently meaningless in the absence of factual findings regarding the parties' intent—in favor of "reside" or "live together" along with a specified period of time.

clause and would hold that Lawrence Graev is entitled to judgment as a matter of law.

Chief Judge KAYE and Judges CIPARICK and JONES concur with Judge READ; Judge GRAFFEO dissents in a separate opinion in which Judges SMITH and PIGOTT concur.

Order reversed, etc.