■ STANLEY COHEN, Respondent-Appellant, v PAULINE COHEN, Appellant-Respondent. [993 NYS2d 4]—

Judgment, Supreme Court, New York County (Barbara Jaffe, J.), entered May 9, 2013, to the extent appealed from, dissolving the parties' marriage, granting plaintiff physical and legal custody of the parties' child, directing plaintiff to pay defendant non-durational maintenance of $26,000 per month, and directing plaintiff to continue to maintain defendant's two $300,000 life insurance policies and to purchase and maintain a $2.5 million life insurance policy naming defendant as sole beneficiary, unanimously modified, on the law and the facts, to reduce the amount of non-durational maintenance to $22,500 per month and to reduce the amount of life insurance that plaintiff is required to purchase to $1 million, and otherwise affirmed, without costs. Appeals from orders, same court and Justice, entered on or about April 16, 2012, May 7, 2012, June 14, 2012, August 14, 2012 and February 5, 2013, unanimously dismissed, without costs, as subsumed in the appeal from the judgment.

Order, same court (Matthew F. Cooper, J.), entered on or about May 30, 2013, which awarded defendant attorneys' fees in the sum of $175,000, unanimously affirmed, without costs.

Plaintiff husband, now 79, is a United States citizen. In or around 1990, he established, for his security and investment transactions, Scone Investments, a limited partnership in which he is a general partner. In the mid-1990s, he created the Scone Foundation, which provides financial awards and prizes to artists and archivists.

In 1996, while living in France, plaintiff met defendant wife, now 54, and they moved in together. Defendant, a documentary film maker and assistant director, was a citizen of Belgium and France. In 1998, defendant became pregnant and stopped working. On April 30, 1999, plaintiff created the Second Stanley Cohen Irrevocable 1999 Family Trust (1999 Trust), primarily for the benefit of defendant and their issue, although his daughter from a previous marriage is also a beneficiary.

On June 7, 1999, the parties executed a prenuptial agreement in France, which provided that upon marriage, each party's premarital property would remain his or her separate property, that property titled in individual names acquired during the marriage would be the property of the person in whose name it was titled, and that jointly titled property acquired during the marriage would be jointly owned marital property. The parties married on June 14, 1999, and on July 10, 1999, their son was born.

In 2001, Scone Investments purchased two apartments in the Galleria, an apartment building in Manhattan. A third apartment in the building was later purchased. In 2002, the 1999 Trust purchased a 4,000-square-foot apartment in Paris.

During the marriage, the parties moved to the United States. They separated in 2006, but plaintiff continued to provide defendant with financial support. Plaintiff commenced this divorce action in March 2009. In a prior appeal (93 AD3d 506 [1st Dept 2012]), this Court affirmed the order of the trial court that held that the French prenuptial agreement was valid.

After a 2011 on-the-record "agreement" was vacated, the parties proceeded to trial in 2012. The trial was bifurcated, with specific days reserved for testimony regarding custody and other days for testimony about finances. Although defendant was cross-examined during the financial phase of the trial, on May 18, 2011, in the midst of her cross-examination on custody issues, she left New York and returned to Paris. The attorney for the child requested that defendant's testimony on custody be stricken because she was not cross-examined. Plaintiff's at-

torney requested that all of defendant's testimony, including testimony on finances, be stricken. Defendant's counsel asked for time to permit defendant to appear again. The court provided defendant's counsel with an opportunity to explain her absence, and adjourned the trial to June 6, 2012.

Despite the three-week adjournment, defendant did not return to court, claiming that she was under doctor's orders not to travel. The court refused defendant's request for a further adjournment or to allow her to appear via Skype, and ended the trial on June 7, 2013. The court drew an adverse inference against defendant with respect to custody issues based on her failure to complete her cross-examination, but refused to default her or to strike her testimony in its entirety.

On the record before us, the court properly vacated the parties' 2011 on-the-record agreement. To be enforceable, an open court stipulation must contain all of the material terms and evince a clear mutual accord between the parties (*see* CPLR 2104; *Bonnette v Long Is. Coll. Hosp.*, 3 NY3d 281, 286 [2004]; *Thome v Alexander & Louisa Calder Found.*, 70 AD3d 88, 103-104 [1st Dept 2009], *lv denied* 15 NY3d 703 [2010]). The 2011 on-the-record agreement was too incomplete and indefinite to be enforceable, and was merely a non-binding agreement to agree (*see Joseph Martin, Jr., Delicatessen v Schumacher*, 52 NY2d 105, 109 [1981]; *Bernstein v Felske*, 143 AD2d 863, 865 [2d Dept 1988]). The parties disagreed whether the proposal included a waiver of maintenance and they did not finalize the details of the transfer of the 1999 Trust. Other material terms were never agreed upon, and the agreement was subject to the consummation of future conditions and additional agreements.

The agreement also lacked consideration (*see Whitmore v Whitmore*, 8 AD3d 371 [2d Dept 2004]). Accepting defendant's consent to the divorce in exchange for the financial payments would have been against public policy (*see Charap v Willett*, 84 AD3d 1003 [2d Dept 2011]). In any event, the parties unambiguously agreed that "whether we hammer out the agreement or not, the divorce will go forward uncontested." There is no merit to defendant's claim that her decision to avoid a public trial on fault grounds constituted consideration because it would have brought up embarrassing and difficult questions for plaintiff concerning his financial dealings.

The court correctly precluded defendant from introducing evidence of French law on equitable distribution at trial. There is no need for extrinsic evidence because the parties' prenuptial agreement unambiguously precludes equitable distribution (*see Van Kipnis v Van Kipnis*, 11 NY3d 573, 579 [2008]). Contrary to

defendant's apparent contention, while the trial court previously held that the parties' prenuptial agreement was enforceable in New York because it was validly executed under French law, it did not rule that French law would apply to the ancillary divorce issues to be tried in this New York action; nor did this Court so rule in affirming the trial court's order.

The court properly considered all the circumstances and the best interests of the child in awarding plaintiff sole legal custody (*see Eschbach v Eschbach*, 56 NY2d 167 [1982]). While the child reported initially that he wanted to move to Paris and live with defendant, and the forensic expert expressed some concern about plaintiff's parenting, the expert also testified as to some serious concerns about defendant, including her suicide attempts and her rigidity. Most significantly, it came to light in May 2012 that defendant had been pressuring and manipulating the child, who was then nearly 13 years old; her contact with him was temporarily suspended, and plaintiff was granted temporary custody. During a second *Lincoln* hearing (*see Matter of Lincoln v Lincoln*, 24 NY2d 270 [1969]), the child revealed to the court his deep-seated issues with defendant, and the court continued plaintiff's temporary custody. Instead of addressing these serious issues, defendant called two witnesses to attack the child's general veracity. Defendant then elected to return to France before her cross-examination was completed, and the court reasonably drew a strong negative inference as to her credibility and fitness as a parent. Thus, there is a sound and substantial basis in the record for the court's custody determination (*see Matter of James Joseph M. v Rosana R.*, 32 AD3d 725 [1st Dept 2006], *lv denied* 7 NY3d 717 [2006]).

The denial of defendant's request for a further adjournment of the trial after she returned to France was not a clear abuse of the court's discretion, and should not be disturbed (*see Pezhman v Department of Educ. of the City of N.Y.*, 113 AD3d 417 [1st Dept 2014], *lv denied* 22 NY3d 863 [2014], *cert denied* 572 US —, 134 S Ct 2303 [2014]). The record fully supports the court's finding that defendant's failure to return to court, despite a three-week adjournment, was of her own making (*see Matter of Steven B.*, 24 AD3d 384 [1st Dept 2005], *affd* 6 NY3d 888 [2006]; *see also Matter of Samida v Samida*, 116 AD3d 779 [2d Dept 2014]). Defendant failed to submit an affidavit explaining her absence on the May 18th date or on the June 6th date. To the extent she relies on her claim of medical injury, the claim is unavailing, since the unsworn medical note provided to the court was brief and vague (*Gramma v Gramma*, 161 AD2d 899 [3d Dept 1990]). While she now claims that she needed only a

two-week adjournment, defendant gave no indication to the court that she would be able to return on a certain date, and her counsel had no knowledge of when she could actually do so.

Defendant also contends that she could not adequately respond to the allegations against her without the *Lincoln* hearing transcripts. However, the record demonstrates that she was well aware of the substance of the child's allegations and that she had every opportunity to address and respond to them, and she has not established that the court abused its discretion in refusing to release the transcripts (*see Matter of Anderson v Harris*, 73 AD3d 456, 458 [1st Dept 2010]). In any event, the two in camera meetings were only one factor in the court's custody determination.

Defendant's net worth statement, excluding housing costs, listed monthly expenses of more than $62,000. She asks that this court restore plaintiff's obligation to pay her non-durational maintenance of $26,000 per month.* Plaintiff asks that the award of maintenance be stricken in its entirety or that the amount and duration of the maintenance be drastically reduced. For the reasons that follow, we find that the award of $26,000 per month in non-durational maintenance is excessive, and should be reduced to $22,500 per month.

Generally, the determination of maintenance is within the sound discretion of the trial court upon consideration of the relevant factors enumerated in Domestic Relations Law § 236 (B) (6) (a) and the parties' pre-divorce standard of living (*see Hartog v Hartog*, 85 NY2d 36, 50-51 [1995]; *Morrow v Morrow*, 19 AD3d 253 [1st Dept 2005]). However, "the authority of this Court in determining issues of maintenance is as broad as that of the trial court" (*Reed v Reed*, 55 AD3d 1249, 1251 [4th Dept 2008]; *see also DiNozzi v DiNozzi*, 74 AD3d 866 [2d Dept 2010]).

The factors to be considered in awarding maintenance include "the standard of living of the parties during the marriage, the income and property of the parties, the distribution of marital property, the duration of the marriage, the health of the parties, the present and future earning capacity of both parties, the ability of the party seeking maintenance to become self-supporting, and the reduced or lost lifetime earning capacity of the party seeking maintenance" (*Alleva v Alleva*, 112 AD3d 567, 568 [2d Dept 2013] [internal quotation marks omitted]).

These factors must be evaluated along with the fact that

---

* By order entered October 31, 2013, this Court granted plaintiff's motion for a stay of the judgment on condition that he pay defendant maintenance of $10,000 per month and maintain the life insurance benefiting defendant in the amount of $600,000.

"[t]he overriding purpose of a maintenance award is to give the spouse economic independence" (*see Bains v Bains*, 308 AD2d 557, 559 [2d Dept 2003]).

Here, defendant had the primary homemaking and child-raising responsibilities during the marriage. The parties enjoyed a lavish lifestyle, both before and, significantly, after their separation, and plaintiff assumed the role of financial provider, acquiescing in defendant's financial dependency. Defendant is not going to receive a distributive award, her own assets are limited, and the record does not contain evidence of the amount of income that she will receive from the 1999 Trust. Defendant also suffers from a mild cognitive impairment that compromises her ability to work, both within and outside of the film industry, and she is incapable of supporting herself at a standard of living approximating the marital standard. While plaintiff asserts that his assets decreased during the recent financial crisis in the United States, they have presumably rebounded with the recovery of the financial markets. In any event, they are still substantial and, along with plaintiff's annual income, are more than sufficient to provide for defendant's reasonable needs.

On the other hand, defendant made little or no financial contribution to the marriage, and her efforts as a mother were diminished by her manipulation of the child. The costs listed in defendant's statement of net worth were based on her life in New York, including expenses for the child. Defendant failed to provide a specific account of the money she alone required, and the court improvidently made certain assumptions in that regard. Thus, taking into consideration the statutory factors, including the parties' extravagant lifestyle (*see Summer v Summer*, 85 NY2d 1014 [1995]; *Costa v Costa*, 46 AD3d 495, 497 [1st Dept 2007]), defendant's dependence on plaintiff, the absence of a distributive award, and defendant's cognitive impairment insofar as it detrimentally affects her ability to become self-supporting (*see Miceli v Miceli*, 78 AD3d 1023, 1025 [2d Dept 2010]), an award of non-durational maintenance of $22,500 per month is appropriate.

Plaintiff contends that defendant should not be awarded maintenance because of her refusal to submit to a complete cross-examination, which prevented the court from ascertaining her standard of living at the time of the divorce action, in contrast to the time earlier in the marriage when the parties co-resided. When a party, through no fault of its own, "is deprived of the benefit of the cross-examination of a witness," a court may strike that witness's direct testimony in whole or in part (*Gallagher v Gallagher*, 92 App Div 138, 140 [1904] [internal

quotation marks omitted]; *Diocese of Buffalo v McCarthy*, 91 AD2d 213, 220 [4th Dept 1983], *lv denied* 59 NY2d 605 [1983]). Although we do not condone defendant's failure to return to court to complete her cross-examination during the custody phase of the trial, and firmly believe that this conduct must be sanctioned, we find, under the particular circumstances before us, that the court providently exercised its discretion when it drew a negative inference against defendant with respect to custody issues but declined to strike her testimony in its entirety. Among other things, the court was familiar with the parties' lavish standard of living during the marriage and defendant testified and was cross-examined for a number of days during the financial phase of the trial. During this testimony, defendant acknowledged that her food and unreimbursed medical expenses had decreased, that many of the amounts in her net worth statement reflected the way the parties lived before separating, and that she had reduced her spending on many of these items. Accordingly, plaintiff's claims of prejudice are overstated, and a negative inference with respect to custody was an adequate sanction for defendant's misconduct.

The court properly required plaintiff to maintain a policy of life insurance naming defendant as the sole beneficiary (*see* § 236 [B] [8] [a]; *Hartog*, 85 NY2d at 50). However, in view of our reduction of the maintenance award, and the high premium costs due to plaintiff's advanced age, the amount of additional insurance that defendant is required to purchase should be reduced from $2.5 million to $1 million.

The court properly awarded defendant $175,000 in counsel fees after considering the financial positions of the parties and the circumstances of the case, including the unnecessary litigation caused by defendant (*see* Domestic Relations Law § 237; *Johnson v Chapin*, 12 NY3d 461, 467 [2009]; *DeCabrera v Cabrera-Rosete*, 70 NY2d 879 [1987]; *O'Shea v O'Shea*, 93 NY2d 187, 193 [1999]). Concur—Sweeny, J.P., Renwick, Andrias, Richter and Kapnick, JJ.