OPINION OF THE COURT
Richard A. Dollinger, J.
1. Introduction — Facts
In this matter, the court revisits a familiar question: in the absence of remarriage, when can a trial court terminate maintenance? Thirty-six years ago, the Court of Appeals, working within the confines of section 248 of the Domestic Relations Law, decided this question in Northrup v Northrup (43 NY2d 566, 572 [1978]), and held that unless the person is “(1) habitually living with a man, and (2) holding herself out as his wife,” no modification is permitted. But now, decades later, the concept of maintenance has been restructured by the legislature to provide financial assistance based on a model of “economic independence.” As a result, the burden of proof needs careful reexamination to assure that fairness to both the payor and post-separation economic independence of the recipient is achieved.
The salient facts, adduced during a hearing, are undisputed. The husband and wife are not yet divorced, as there are still issues remaining. The court ordered maintenance at the commencement of the action, based on the disparity of incomes between the couple. The husband now moves to terminate the maintenance.
After the husband and wife separated, the wife admits that she lived with another man, shared a bedroom, commingled her finances with her partner as they shared a joint checking account, and accepted an engagement ring from the partner. She acknowledges that she shared “family activities” with the partner, and allowed this person to be listed as an emergency contact for her child. They shared birthdays and holidays, and traveled together. In an email, admitted at trial, the wife acknowledged to her husband that she “expected [the] payments [of maintenance] to end when she moved in with her significant other.” However, the wife, under direct examination *708 from her counsel, stated that she never “held herself out” as the spouse of her boyfriend, and never told anyone that she was married to him, and continues to insist on her ex-husband’s compliance with the maintenance order. Based on these facts, the husband seeks a declaration that he can discontinue his maintenance payments to the wife.[1]
2. Introduction — Law
In order to terminate or modify maintenance, the Domestic Relations Law contains two mechanisms. The first is Domestic Relations Law § 236 (B) (9) (b) (1), which contains two provisions for modification: if the maintenance is set forth in a prior order, then any modification requires proof of a substantial change in circumstances or, if the maintenance is set forth in a separation agreement, then “extreme hardship” must be proved. Under current case law, the “substantial change” required to modify a prior order of maintenance is measured by a comparison between the payor’s financial circumstances at the time of the motion and at the time the original order was entered. (Rabinovich v Shevchenko, 120 AD3d 786 [2d Dept 2014]; Ashmore v Ashmore, 114 AD3d 712 [2d Dept 2014]; see also Leo v Leo, 125 AD3d 1319 [4th Dept 2015] [with respect to the burden of proof to be applied when a party seeks to reduce the amount of maintenance set forth in a separation agreement that has been incorporated, but not merged into a judgment of divorce, that party has the burden of establishing “extreme hardship”].) In this case, there is simply insufficient evidence to justify a conclusion that there has been a substantial change in the payor’s financial circumstances since the date of the original order of maintenance. The husband testified that he expended substantial sums in litigating this divorce, which caused him some economic hardship, and that the support obligations were draining his discretionary income, but this does not constitute a substantial change. Unless this court, in considering the scope of the “substantial change” can consider factors other than the husband’s ability to pay, Domestic Relations Law § 236 (B) (9) (b) (1) does not provide relief here. What is significant in reviewing this portion of the *709 Domestic Relations Law is that the legislature and the courts have viewed both the mandate to pay maintenance, and the criteria to change it, as grounded by the legislature in the payor’s and recipient’s economic circumstances. The “substantial change” or “extreme hardship” standards are both based on the relative economic circumstances of the payor or the recipient. As best as this court can determine, the question of whether the financial circumstances of the recipient alone — their economic interdependence on a third-party with whom they reside — can provide a ground for modifying maintenance under Domestic Relations Law § 236 (B) (9) (b) (1) is untested.
3. The Enactment of Domestic Relations Law § 248 — Legislative History
The second statutory mechanism was the focus of the hearing in the case: whether the wife is “holding herself out” as the spouse of another sufficient to justify termination or modification of maintenance. (Domestic Relations Law § 248.) The statute provides:
“The court in its discretion upon application of the husband on notice, upon proof that the wife is habitually living with another man and holding herself out as his wife, although not married to such man, may modify such final judgment and any orders made with respect thereto by annulling the provisions of such final judgment or orders or of both, directing payment of money for the support of such wife.” (Domestic Relations Law § 248.)
The enactment of section 248 by the legislature in 1938[2] occurred after a perfect storm of events regarding an ex-spouse living with someone else and alimony. In 1904, the legislature determined that public policy dictated that a woman who had received a final decree of divorce in her favor, from her husband, should no longer be permitted to hold her husband liable for alimony after she remarried. (L 1904, ch 339, cited in Waddey v Waddey, 290 NY 251, 255-256 [1943].) A decade later, *710 the Court of Appeals in Hayes v Hayes (220 NY 596 [1917]), held that immoral conduct by a wife — as distinguished from remarriage — was insufficient to justify terminating alimony.[3]
While the courts were grappling with the impact of post-divorce “immoral conduct” on the obligation to pay alimony, the legislature took another step involving “immoral conduct and marriage” and abolished the common-law marriage doctrine in 1933. Under that doctrine, if the evidence established that legally competent parties in praesenti intended to become husband and wife and thereafter lived and cohabited as husband and wife, such a marriage existed. (Matter of Haffner, 254 NY 238, 242 [1930].) In attempting to decide whether to create marital obligations for couples living without the benefit of a formalized marriage ceremony, the courts had, prior to 1933, focused on circumstantial evidence of such an intention. The courts had long held that cohabitation and reputation as husband and wife, acknowledgment, declarations, conduct, repute, reception among neighbors, and relations and the like, are all probative of marital status. (Gall v Gall, 114 NY 109, 118 [1889]; Clayton v Wardell, 4 NY 230, 238-239 [1850] [couple were married, under common law, if they “held themselves out to the world as such”].) The courts used the phrase “holding out” as evidence that the couple were projecting to others the impression that they were living as husband and wife. “Holding out” was one of the “bits of evidence” more or less cogent in showing that such agreement to be married was made. One court added “sometimes they are the only available evidence of such agreement.” (Matter of Cooke, 195 Misc 468, 470 [Sur Ct, Queens County 1949].) In essence, New York courts before 1937 would consider a common-law marriage, without the need for a formal ceremony, if the couple cohabitated, and were reputed to be husband and wife. (Matter of Heitman, 154 Misc 838 [Sur Ct, Niagara County 1935], affd 247 App Div 855 [4th Dept 1936], affd 272 NY 533 [1936] [to establish a common-law marriage by cohabitation and reputation it must appear that the cohabitation was apparently matrimonial, continuous and regular, and that the reputation was general and not divided and the conduct of the parties must be such that almost anyone ac *711 quainted with them would naturally infer that they bore the relation to each other of husband and wife].)[4] Importantly, under this standard of proof, a declaration by either party that the other was their husband or wife, while probative of a common-law marriage, was not necessary for such a finding. Conduct, repute, reception among neighbors, and relations and the like were equally compelling. (Gall v Gall, 114 NY at 118.)
Constructed in the backdrop of these legislative enactments and judicial decisions involving relationships between couples, it seems indisputable that the legislature’s use of the phrase “holding out” in the precursor to section 248 in 1938 was derived from the long-standing use of that term as a component of the proof necessary for establishing a common-law marriage. In section 248, the legislature, in using the phrase “holding out,” borrowed the same circumstantial evidence test from its well-established common-law marriage precedents: “holding out” was proven if the couple lived in a marriage-like living arrangement to a degree that a bystander, observing the couple, would conclude that they were acting in roles comparable to a husband and a wife. Section 248 did not require a court to find all the proof of a “common law marriage” — reputation as husband and wife, acknowledgment, declarations, conduct, repute, reception among neighbors and relations — before alimony could be modified. The “holding out” necessary to modify maintenance under section 248 was a lesser standard of proof — only one of the factual predicates need be proved— than the proof required for a finding of a common-law marriage.
As the statutory history indicates, the clear intention of Domestic Relations Law § 248 was to broaden the discretion of trial judges to be able to modify maintenance, especially when, as a result of the ex-spouse’s relationship with another person, the alimony payments would be supporting the new “couple,” rather than the independent ex-spouse. A further analysis of exact circumstance attendant upon the enactment of section 248 supports this conclusion. In Citron v Citron (91 Misc 2d 785 [Sup Ct, Nassau County 1977]), decided a year before Northrup v Northrup, the trial court found that the legislature’s enactment of section 248 was designed to give judges discre *712 tion to modify maintenance if the former spouse lived with a member of the opposite sex while “she was being accepted by society as another man’s wife.” (Citron v Citron, 91 Misc 2d at 792.)[5] After the lengthy analysis of the statutory history, the court recognized that reputation — how the couple was perceived by others — was the critical ingredient in applying the “holding out” principle in Domestic Relations Law § 248.
Finally, the legislature, in inserting the phrase “holding out” did not quantify the extent of the required holding out, even though prior case law indicates that the holding out to justify a common-law marriage had to be widespread among the public. (See Blek v Blek, 306 NY 27, 30 [1953, Fuld J., dissenting] [“their holding themselves out as such to a few people is not sufficient” to establish a common-law marriage].) By failing to quantify to whom the “holding out” would be manifest or how long it has to persist, the legislature left it to the courts to decide what duration and what forms of “holding out” would justify a court to exercise discretion to modify or terminate maintenance.
4. Court of Appeals Review of Domestic Relations Law § 248 in Waddey v Waddey
When first confronted with the language of Domestic Relations Law § 248, the Court of Appeals, in a 4-2 decision, considered whether it should be applied retroactively. (Waddey v Waddey, 290 NY 251 [1943].) In Waddey, the husband was required to pay $25 a week in maintenance. When the husband attempted to modify his maintenance based on the 1904 statute which allowed termination of maintenance upon remarriage, *713 he failed because he could not prove that his former wife had remarried. However, through his attorney he succeeded in having section 1159 of the Civil Practice Act modified into what is now Domestic Relations Law § 248.® When the husband renewed his request to terminate maintenance after enactment of the statute, the trial court referred the matter to a referee, who authored an opinion that the wife’s conduct was tantamount to “holding herself out as the wife of another.”[6]
[7] The Supreme Court affirmed the referee’s report, without elaboration, and the Appellate Division affirmed. The Court of Appeals reversed, holding that the statute could not be applied retroactively. The Court acknowledged that Civil Practice Act § 1172-c (Domestic Relations Law § 248) was designed to terminate maintenance only if the former spouse failed a “character” test. The Court noted that “the Legislature determine [d] that public policy required a ban on further alimony payments provided in a final decree of divorce granted to the wife for the wife’s failure otherwise to live, subsequent to the divorce, in her character of former wife.” (290 NY at 256.) Importantly, when read in the light of the prior statutes, the Court of Appeals suggested in Waddey v Waddey that Civil Practice Act § 1172-c must be read to mean that the “holding out” was some amount of proof less than what was required to establish a common-law marriage. The “holding out” in Civil Practice Act § 1172-c required only proof that the spouse was no longer living in the “character of a former wife.” The standard of proof, in the original Court of Appeals analysis of the statute, was an “objective” standard, a community based perception that the ex-spouse was now acting — projecting to the public — as if she was no longer dependent on her former spouse for support. Judge Desmond’s dissent discusses the broader question of the legislative intention in the precursor to Domestic Relations Law § 248:
*714 “Alimony is not a property settlement or a finally arrived at division between husband and wife of the former’s income. It is a device for enforcing our public policy that an innocent wife’s sustenance by her guilty husband should be continued after the divorce. But it would be a faulty public policy which would enforce the husband’s public duty of support and not the correlated public duty of the wife. The Legislature, by the statute we are examining, has ordained that the wife’s right to continued support from her husband after divorce, shall be forfeited by such misconduct as here appears.” (Waddey v Waddey, 290 NY at 258 [Desmond J., dissenting].)
Importantly, in this first examination of what would become Domestic Relations Law § 248, the Court did not test the quantum or character of proof required to meet the “holding out” clause. All six judges however, in dicta, considered the statute as designed to determine the “character” or “misconduct” of the ex-spouse and the “public duty” or the perception or belief by others of the ex-spouse’s status as part of the determination. In short, for the judges in Waddey, it was the public facts of the post-divorce living arrangements of the recipient of the payment — and not the self-serving statements of the recipient — that a trial court could consider in deciding whether to continue alimony or maintenance. In this first exegesis of what is now Domestic Relations Law § 248, the Court of Appeals was willing to give trial courts discretion if publicly-observed facts indicated that the former spouse was no longer living independently.
5. The Court of Appeals Considers “holding out” in Blek v Blek
In 1953, the Court of Appeals again reviewed the issue of what constitutes “holding out,” albeit in a different context. In Blek v Blek (306 NY 27 [1953]), a 4-3 decision, the issue was whether there was sufficient proof of a “holding out” by a couple to find a common-law marriage.[8] The majority held that the proof established that the couple maintained an apartment together and engaged in other activities — in addition to “holding themselves out” — and these facts were sufficient to establish a “common-law” marriage. The dissent defined the requisites for a common-law marriage:
*715 “One of the prime requisites for establishing a common-law marriage is proof of the couple’s ‘common reputation’ as man and wife; their holding themselves out as such to a few people is not sufficient, particularly where there is compelling evidence to refute the existence of such asserted relationship. ‘Mere reputation,’ as this court long ago said, ‘is never conclusive, except when it is general, and supported by other circumstances.’ ” (Id. at 30 [Fuld, J., dissenting] [citations omitted].)
In this view, the dissenters agreed with the earlier decision in Waddey: what was crucial in deciding whether “holding out” was proved, were the publicly-observed facts that were manifest in “reputation,” i.e, what others, observing the couple, would conclude about their marriage-like status. The Court, narrowly split, disagreed over what form of conduct by a party — or what evidence of reputation — would support a finding “of holding oneself out” sufficient to establish a common-law marriage. But, a reasonable reading of Blek v Blek stands for the notion that the entire Court of Appeals acknowledged that “holding out” was a public perception test, based on facts that could easily be observed by others who observed the conduct of the couple.
6. Pre-Northrup Cases and the Intersection of “misconduct” and the Obligation to Pay Alimony
In the wake of the 1966 amendments expanding the grounds for divorce,[9] litigants began to seek to terminate postjudgment alimony awards. The rationale may have been based, in part, on the then-current version of the Domestic Relations Law, which had been interpreted to permit trial courts to deny alimony to spouses who were guilty of misconduct during their marriages. (Hessen v Hessen, 33 NY2d 406 [1974] [under section 236 of the Domestic Relations Law, a divorce granted on the basis of the wife’s “misconduct” will deprive the wife of her right to alimony]; Math v Math, 39 AD2d 583, 583 [2d Dept 1972], affd 31 NY2d 693 [1972] [the trial court had power to make provision for defendant’s support only if “defendant’s misconduct did not itself constitute grounds for separation or divorce”]; Matthews v Schusheim, 42 AD2d 217, 222 [2d Dept *716 1973], affd 35 NY2d 686 [1974] [plaintiff was burdened with the finding of adultery against her and under these circumstances, an award of alimony was extremely unlikely].) If a husband alleged adultery in his divorce complaint, the wife was even denied temporary alimony if there was a sufficient showing that the wife may be guilty of that conduct. (Nobel v Nobel, 49 AD2d 850 [1st Dept 1975].) Because misconduct— including adultery — defeated a wife’s claim for alimony if it occurred during the marriage, payors of alimony sought to curtail their payments in postjudgment proceedings when their ex-spouses were cohabitating or having intimate relationships with a new partner.
In three instances before Northrup v Northrup, New York trial courts found sufficient circumstantial evidence of “holding out” to justify modification of alimony awards under Domestic Relations Law § 248. In Matter of Anonymous (90 Misc 2d 801 [Fam Ct, Nassau County 1977]), the divorced wife and man with whom she was living acted in manner that would indicate a husband and wife relationship, including socializing and traveling as a couple, so that a reasonable person would believe that they were living in a marital relationship. Under these factual predicates, there was a “holding out” of the woman as the man’s wife within meaning of statute providing for termination. The court noted:
“[E]very day when he was through with his normal day’s work, Ted came home to Carol; they spend their weekends together; he had no other residence; they ate their meals together; they socialized as a couple; she never went out with any other man; they shared the food shopping; Ted does the normal chores both inside and outside the house; they go on trips together; Carol’s children refer to Ted’s parents as grandma and grandpa; Ted takes Carol’s children to sporting events; together with other acts that would indicate a husband and wife relationship.” {Id. at 804.)
Based on these facts, the court considered whether to modify maintenance. But, in a sentiment that echoes in this case, the court held:
“In this day, when the courts are striving to eliminate discrimination between the sexes, section 248 is a step backward to the dark ages. The statute provides ‘that the court in its discretion upon application of the husband’ may modify a final judg *717 ment. Relief is, therefore, limited to the husband, at the expense of the wife. Although she has become a divorced person, she may be penalized for her sexual activities while no penalty is imposed upon the former husband if he participates in similar sexual activities. Furthermore, the statute and case law make it safer for a divorced woman to avoid the punitive effect of section 248 by playing the field with different men for short periods of time. On the other hand, if she resides with one man for a continuous period of time in a relationship that can reasonably be regarded as a husband and wife relationship, she does so at her economic peril.” (Id. at 809 [citations omitted].)
The court added:
“In view of the present broad discretionary powers granted to the court in section 236 of the Domestic Relations Law, the court questions the need to retain section 248. The court now has the power, under section 236, upon application of either the husband or the wife, to annul or modify an order or final judgment based upon the economic circumstances of the case and of the respective parties as justice requires.” (Id. at 809-810)
The court in Matter of Anonymous recognized that the legislature was requiring courts to consider economic factors in the continuing payment of maintenance and discarding the aged-out “misconduct” standard. Under the economic standard, courts could find “holding out” based on a plethora of shared objective, economic-based factors, and without a declaration by the recipient that she or he was “a wife or husband” to a third party.[10] Significantly, the court in Matter of Anonymous nonetheless declined to modify the maintenance under section 248 because, it concluded, the husband, seeking relief, had approved his former wife’s conduct, and to allow modification would be “a travesty of justice.” (Id. at 811.)
In another opinion, then trial judge and future Court of Appeals Judge Howard A. Levine held that modification of alimony under Domestic Relations Law § 248 was permissible *718 because the former spouse was living with another man and the new couple had told their landlord that they were husband and wife. (Matter of Hall v Hall, 82 Misc 2d 814 [Fam Ct, Schenectady County 1975].) Based on this evidence and the wife’s casual declaration, the court found that the discretion to modify the maintenance was triggered when there was evidence that “payments made by the respondent are being applied to the joint living expenses of petitioner and the man with whom she is living.” (Id. at 816.) The court added:
“The State, in exercising its traditional power to regulate the marital relationship, can rationally distinguish between persons merely living together in a temporary liaison and the more permanent relationship described in the statute of ‘habitually living with another man and holding herself out as his wife.’ Moreover, discretion is granted to the court under the statute to apply it as the circumstances in each individual case require. . . .
“While the statute is couched in terms of these two alternative extremes, and has never been applied otherwise in any reported case, the grant of discretion in this portion of section 248, together with the general legislative policy embodied in section 236, as discussed above, permits the court to take a flexible approach to fit the determination to the ‘circumstances of the case and the respective parties.’ ” (Id. at 816-817.)
Importantly, the court found that the legislature had broadened consideration of economic factors in the amendments to the Domestic Relations Law, noting:
“[T]he Legislature has expressed its version of contemporary standards of equity and fairness regarding the economic rights and obligations arising out of marriage in section 236, as incorporated in the Domestic Relations Law in 1962 and amended in 1968. As indicated in the practice commentary to section 236 in McKinney’s edition of the Domestic Relations Law, the court is given broad discretion to fashion an order according to the economic and personal circumstances of the parties, the length of the marriage and ‘the circumstances of the case’ (McKinney’s Cons. Laws of N.Y., Book 14, Domestic Relations Law, § 236, p 136). Indeed, had the predecessor to section 236 vested such broad discretionary power in the court, the neces *719 sity for a specific statutory provision to deal with the situation of the ex-wife living with another man and holding herself out as his wife is questionable.” (Id. at 816.)
The Appellate Division, Third Department, affirmed the court’s findings of “holding out” and confirmed the modification of the award. (Matter of Hall v Hall, 55 AD2d 752 [3d Dept 1976].)
In a third case, just before the Court of Appeals decision in Northrup v Northrup, a trial court judge refused to find a “holding out” under the statute even though the new friend of the ex-wife shared a bedroom with her. The proof before the court was simply cohabitation: the ex-wife shared a bedroom with the friend, but there was no evidence of any economic interdependence between the two. The court in Citron v Citron (91 Misc 2d 785 [Sup Ct, Nassau County 1977]) adopted the same perspective that the Court of Appeals adopted a year later in Northrup v Northrup, but added an additional comment:
“The wording of section 248 is clear and unambiguous. It mandates the termination of alimony in the event of the wife’s remarriage and empowers a court, in its discretion, to terminate it when it has been established that a wife is habitually living with another man and is holding herself out as that man’s wife. Simple and concise; termination upon remarriage, possible termination upon assuming the outward appearance of a remarriage.” (Citron at 787 [emphasis omitted].)
In Citron v Citron, the court, while rejecting a modification, embraced the reputation based standard for concluding that a “holding out” under section 248 existed — the “outward appearance of a remarriage” was sufficient to find a “holding out” and justify possible termination of alimony. (Id.)
Importantly, the court holding in Citron v Citron supports the conclusion that the legislature never intended the “holding out” language in section 248 to require the same level of proof required to establish a common-law marriage. If the ex-spouse was “holding oneself out” as a spouse of the new friend, then the person would be married at common law and the phrase which follows “holding oneself out” in section 248 — “although not married to such man” — would have no meaning. The legislature’s use of the “holding out” phrase in section 248 was not equivalent to the “holding out” necessary to establish a common-law marriage and the legislature must have intended some lesser proof — described in Citron v Citron as the “outward *720 appearance of a remarriage” — to justify the exercise of discretion to modify a maintenance award. (Id. at 787.)
7. Northrup v Northrup and the Standard of Proof to Alter Maintenance
In 1979, the Court of Appeals finally resolved the question of what a “holding out” meant in Domestic Relations Law § 248 and what proof was required to meet that statutory test. In Northrup v Northrup (43 NY2d 566 [1978]), an ex-wife lived with a man, shared the same bedroom with him, cooked meals, did his wash, permitted him to use her car, and shared household expenses with him, but there was no evidence that she ever stated to anyone that she was married to this other man. The trial court, sitting in the Monroe County Supreme Court, held that the legislature in enacting section 248 did not intend the continued payment of alimony to be dependent merely upon statements or representations made by a former wife and construed the statute to mean “statements or conduct which would lead a person to believe that the parties are living and associating as husband and wife.” (Northrup v Northrup, 43 NY2d at 570 [citing the trial court decision] [emphasis omitted].) The Appellate Division, Fourth Department, unanimously affirmed, finding that “cohabitation in what might be reasonably considered a marital relationship is sufficient to satisfy the statutory predicate.” (Id.; see Northrup v Northrup, 52 AD2d 1093 [4th Dept 1976].)
The Court of Appeals, in a 5-2 decision, reversed, holding that the issue of maintenance is purely one of statutory construction and the courts had no common-law jurisdiction over divorce or its incidents. (Northrup v Northrup, 43 NY2d at 566.) The Court reviewed the legislative history, acknowledged the connection to the Waddey case and cited Citron v Citron (91 Misc 2d 785, 789 [Sup Ct, Nassau County 1977]), and its dissection of the legislative history of section 248. When it came to the interpretation of the statute, the Court majority held: “The statute thus imposes two requisites for the termination of alimony in the absence of remarriage: (1) habitually living with a man, and (2) holding herself out as his wife. The courts are without power to modify merely on proof of one.” (Id. at 571-572.) At the crux of the Court’s determination is a requirement that the recipient engage in “some assertive conduct” that demonstrated that she was “holding herself out” as another’s spouse. (Id. at 571.) The proof before the trial *721 court — living together, cooking meals, washing the partner’s clothes, permitting use of the ex-spouse’s car and sharing household expenses which the lower court had concluded were sufficient to “lead a person to believe that the parties are living and associating as husband and wife” — was not sufficiently “assertive” to meet the Court’s test.
Searching for some examples of a holding out that would justify modifying or terminating maintenance under its constricted view of section 248, the Court of Appeals majority could apparently find no New York cases that satisfied this test. Instead, the Court sought refuge in two cited out-of-state cases. In People v Shokunbi (89 Ill App 2d 53, 58, 232 NE2d 226, 229 [1967]), an Illinois court held (in a criminal matter) that “holding out” meant “some assertive conduct directed towards the public which would indicate or imply that” an individual was a physician and that the proffered proof was insufficient to find a “holding out.”[11] The Court of Appeals also cited a California case, Lang v Superior Court (53 Cal App 3d 852, 126 Cal Rptr 122 [1975]), which, according to the appellate judges in California, was a case of first impression under California’s “holding out” statute. The California court turned to a dictionary and concluded that “it [was] sufficient, therefore, to define ‘holding out’ ... as assuming the status of a spouse or representing oneself as such.” (53 Cal App 3d at 859, 126 Cal Rptr at 127.) The California court further held that obtaining a common telephone number and a joint checking account were sufficient to establish a holding out and added: “It is not uncommon in our present society for an unmarried couple to live together and appear to all but their close friends to be formally married.” (53 Cal App 3d at 861, 126 Cal Rptr at 128.)
*722 When the Court of Appeals decision in Northrup v Northrup is tested against the California precedence in Lang v Superior Court, a curious — if not inexplicable — conundrum emerges: if an ex-spouse shares a joint checking account and a common telephone number with another person, then the Court of Appeals would conclude that they are “holding themselves out” as a couple, even though no one walking by their shared residence — or watching them drive the same car — would even know either of those facts — one hidden in a telephone book and the other privately buried in a bank vault. But, if the spouse drives the same car as the friend, does the friend’s laundry, takes vacations with the friend, takes the friend to family occasions, cooks the meals, shares household expenses and everyone in the neighborhood knows it and sees it daily, then they are not “holding themselves out,” according to the Court of Appeals. Under Northrup v Northrup, private conduct— sharing a phone number printed in a telephone book[12] and opening a joint checking account that only a bank would know about — is somehow “assertive conduct” sufficient to find “holding out,” but conduct easily visible to the public — living, for all intents and purposes, together in all daily aspects of life — is not.[13] The California Court of Appeals decision, cited in Northrup v Northrup, has, like the Illinois case cited by the *723 Court, also been seldom cited.[14] Regardless, the New York Court of Appeals held even though individuals may live the lifestyle of a married couple, those facts are not “assertive” enough to constitute a “holding out” sufficient to justify any modification of alimony/maintenance. (Northrup, 43 NY2d at 572.) The Court expréssly disapproved the holding in Matter of Anonymous, stating that the “life style” of the parties does not constitutes a “holding out.” (Id. at 571.) The solution to lessen the burden of proof to justify modification of alimony, the Court said, rests with the legislature.[15]
The dissent in Northrup v Northrup argued that the majority’s interpretation of Domestic Relations Law § 248 was narrow, technically unrealistic, and that it frustrated the purpose of the statute. (Northrup v Northrup, 43 NY2d at 572 [Wachtler, J., dissenting].) The dissent would have read the “holding out” language as permitting modification if the couple’s “reputation” was as husband and wife. Justice Wachtler argued that the legislature intended “the courts to consider the extent of the wife’s new relationship without respect to formalities.” (Id. at 573.) The dissent added:
“[O]nce again, [the majority] have read the statute in such a way as to virtually render it a dead letter by requiring a degree of formality which the majority must recognize is unrealistic in terms of current social standards and practices. Indeed the majority concedes that their interpretation of the amendment creates a new method for avoiding the statute.” {Id. at 573.)
Judge Wachtler also intoned that the legislature intended the *724 courts to recognize current social realities in applying the statute:
“In my view, the amendment to the statute following the Waddey decision shows that the Legislature intended the courts to consider the extent of the wife’s new relationship without respect to formalities. They intended the courts to recognize current social realities in applying the statute. Above all they intended to close the loophole and not create a new means for avoidance.” (Id.)
Furthermore, the dissent would have given more discretion to the trial judge, and argued that the amendment was meant to “eliminate injustice and to defuse an emotionally charged situation.” (Id. at 573.)
8. The Court of Appeals Guidance after Northrup— Bliss v Bliss
In 1985, after Northrup v Northrup, the Court of Appeals again explored Domestic Relations Law § 248 and its impact on continued alimony payments. In Matter of Bliss v Bliss (66 NY2d 382 [1985]), the Court unanimously held that evidence that a former wife “habitually lived with another man” and that “the individuals may conform to the life style of a married couple is not enough” to warrant a modification in maintenance. (Id. at 387.) The Court held that “some objective evidence” of a “holding out” by the former wife that she is “the wife” of the other man is required. (Id. at 387.) The Court gave, as an example, if the recipient’s name is listed in a telephone directory or on a checking account using the (man’s) surname— the same test articulated in the California case cited in Northrup.
The Court of Appeals in Bliss v Bliss did finally find a New York case where the ex-wife was “holding herself out” under the Northrup rule. In Matter of Paul S. v Roberta S. (91 Misc 2d 211 [Fam Ct, Queens County 1977]), a boyfriend signed a lease and listed the ex-spouse as his wife, the wife knew of her boyfriend’s representation of her as his spouse, she received W-2s with her boyfriend’s surname, and her employment records listed her as the boyfriend’s spouse. The Court of Appeals approved the conclusion in Paul S. that this proof was evidence of holding out even though the cited proof was not publicly available. None of the records — which the trial court held were evidence of holding out — were records that could be *725 observed by the public. A stranger, meeting the couple, observing their daily life, would never know these private facts — the name on the ex-wife’s driver’s license, the name on her W-2 forms, the name on her employment records — but would observe the couple acting as husband and wife. In citing Paul S., the Court of Appeals seemed to stretch to find any New York example which would meet the “holding out” test. The Court, seemingly uncomfortable in overly restricting the discretion that the legislature had otherwise vested in trial courts, immediately added that the “proof required to demonstrate a holding out is, of course, not limited to the above illustrations.” (Bliss v Bliss, 66 NY2d at 388.)[16]
What is clear, however, is that the Court in Bliss v Bliss reaffirmed the central holding in Northrup v Northrup: cohabitation alone is insufficient as a matter of law to terminate or modify maintenance under Domestic Relations Law § 248. In Bliss, the Court said that a 14-year relationship and the fact that the other man “participated in what may be characterized as family activities” was not sufficient. (Bliss, 66 NY2d at 388.) The Court seemed to consider the fact that the ex-wife continued to use her married surname indicating that she did not hold herself out as “married” to the other man.[17] In the companion case decided on the same day as Matter of Bliss v Bliss (66 NY2d 382, 388 [1985]), the Court held in Matter of Collyer that the fact that the ex-wife “maintained her own checking account and health insurance” was evidence that she was not “holding herself” out as married.[18] Importantly, while *726 reaffirming its allegiance to Northrup, the Court in Bliss v Bliss agreed with the Appellate Division:
“[T]he fact that the construction of the statute compelled by the plain meaning of its language may, in some instances, ‘convert the shield of the statute into a sword of inequity, dependent only upon the deftness with which a former spouse can parry assertions that her conduct in a protracted relationship is marital in substance’ is a matter to be addressed by the Legislature and not by the courts.” (Id. at 389, quoting Matter of Bliss v Bliss, 107 AD2d 394, 397 [1985].)
Nonetheless, while acknowledging the chicanery that the statute may create and the “artificiality” that the holding out principle creates, the Court still left the matter to the legislature.
9, Lower Court Opinions Implementing the Northrup Standard
In the wake of Northrup and its insistence of a high standard of proof for the “holding out” before a court could modify maintenance, the lower New York courts — with the exception of Paul S. v Roberta S. — have almost never applied Domestic Relations Law § 248 to modify a maintenance award or a maintenance provision in an agreement. As an example, in Szemansco v Szemansco (11 AD3d 787 [3d Dept 2004]), the Court denied a petition under section 248, concluding:
“[T]he burden of proof is quite stringent on this requirement. Conduct similar to that alleged by plaintiff in this case — that defendant shares a residence, telephone number, bedroom and meals with this man and that the two travel, spend holidays and attend family functions together — has been held to be insufficient to establish that one holds oneself out as another’s spouse.” (Id. at 788.)
In an earlier case, Sypek v Sypek (130 Misc 2d 796 [Sup Ct, Dutchess County 1986]), another future Court of Appeals Judge Albert M. Rosenblatt applied Northrup v Northrup and declined to terminate maintenance when an ex-wife resided with a 97-year-old man. While the proof failed the “holding out” test, the judge noted the “judicial concern over the arguably rigid second predicate [‘the holding out’], which might motivate a spouse to tailor conduct so as to scrupulously avoid the ‘holding out,’ while fully satisfying the first test.” (Sypek at *727 797.) The court added further that he envisioned the purpose behind section 248 as follows: “Typically, the rationale behind the termination of alimony or maintenance, when the supported spouse cohabits with a third person, is to prevent a paramour from living on support provided by the payor spouse.” (Sypek at 799.) There seems little question that the court was concerned about the consequences of a divorced spouse, who received maintenance and also “second support” from the friend. In declining to find proof of such support, the judge noted that “the wife is not receiving ‘double support that is, second support from anyone with whom she shares bed and board,’ in the context of a new economic unit . . . There is no such sharing or economic unit in any sense of the word.” (Id. at 799 [citations omitted].)[19]
In this court’s research, it has not found a New York case, after Northrup v Northrup, in which a recipient, based on circumstantial evidence, was held to meet the “holding out” test in the statute. (Charland v Charland, 267 AD2d 698 [3d Dept 1999] [where, as here, only cohabitation is proved, modification is not appropriate]; Gunn v Gunn, 240 AD2d 704 [2d Dept 1997] [husband not entitled to termination of his maintenance where he failed to prove that wife, although living lifestyle of married couple with another man, held herself out to be that man’s wife]; Levy v Levy, 143 AD2d 975 [2d Dept 1988]; Sitarek v Sitarek, 179 AD2d 1064 [4th Dept 1992]; Karl v Karl, 138 AD2d 354 [2d Dept 1988]; Lancaster v Lancaster, 141 AD2d 701 [2d Dept 1988] [undisputed that wife used husband’s last name in conduct of all her professional and social activities and she never told anyone that her current boyfriend was her husband].) The impossibly high standard of proof required to meet the “holding out” standard is manifest by the Fourth Department in Okvist v Contro (21 AD3d 1328 [4th Dept 2005]). In that case, a Matrimonial Referee found that, despite evidence that the ex-wife resided with a man, that they attended family functions and “various activities of their respective children together” and are generally considered a “couple” by those witnesses who testified at the hearing, *728 there was no evidence that she holds herself out as his wife. (Id. at 1329.) The Court held that without conduct by the ex-wife, either through direct action or by implication, indicating that she ever wished “anyone to believe” that she was married to her live-in boyfriend, there was no “holding out.” (Id. at 1329.) In short, the continuation of maintenance in that case was premised on the slenderest of reeds: the ex-wife, seeking to protect her right to retain maintenance, simply needed to prove that she never told anyone that she was married or did whatever is necessary to prevent any reasonable person from concluding that she was married to the boyfriend with whom she lived and shared every conceivable family-like event.
This court could find only one case in the post -Northrup and post -Bliss environment where a court modified maintenance based on a finding of “holding out.”[20] That finding occurred in extraordinarily unusual circumstances when an ex-wife, in response to undercover spies from her husband, made a gaff to strangers. In Markhoff v Markhoff (225 AD2d 1000 [3d Dept 1996]), the ex-wife entered into a brokerage agreement for the sale of her residence. While her home was on the market, her ex-husband sent three individuals to her home posing as potential buyers, each of whom subsequently testified that the ex-wife introduced, identified or referred to the boyfriend as her husband. Additionally, a process server testified that when she attempted to serve the boyfriend with legal papers, the ex-wife said he was in the shower and suggested that she return at a later time, stating, “my husband takes long showers.” (Id. at 1022.) Citing Northrup, the Court concluded that such testimony, coupled with the ex-wife’s admission that she referred to her boyfriend as her husband in the context of selling the house, plainly constituted the assertive conduct required to establish that plaintiff held herself out as another man’s wife.[21]
The lengthy list of denied applications leads to only one conclusion: there is simply no amount of circumstantial evi *729 den.ee that would meet the Court of Appeals’ requirements in Northrup v Northrup. Cohabitation is not enough — the Court of Appeals makes that explicit in Northrup v Northrup. Sharing a bedroom is not enough. Attending family events together is not enough. Attending the events of the children of the former marriage together is not enough. Listing the new partner as an emergency contact for the children of the divorced couple at the children’s school is not enough. Sharing a bank account — depositing the recipient’s maintenance check into a joint bank account (accessible to the new partner) — is not enough. The ex-wife paying households bills for the new residence, shared by the friend, is not enough. Referring to the new friend as “a significant other” is not enough. Wearing an engagement ring is not enough. Finally, even if all these facts are proved, together, they are not enough to justify the conclusion that the wife is “holding herself” out as a wife. The Court of Appeals, while adhering — as it must — to the legislature’s direction, nonetheless reads the statute — and instructs New York’s lower courts to read the statute — in such a fashion that they can never modify maintenance, even if the recipient is living with, and financially dependent on, another person. Under the constrictions of the Court of Appeals determination, the lower courts are stripped of the discretion that the legislature intended — to allow courts to modify maintenance when a recipient was, for all intents and purposes, living in a marriage-like relationship and relying on another person for support.
10. The Impact of Graev v Graev and the Emergence of the Economic Partnership Analysis of Marriage
Northrup v Northrup changed the dynamics of post-divorce maintenance payments. Payor spouses, seeking to extract a more reliable method of terminating maintenance when their former spouse lives with another, have used phrases like “cohabitation” — standing alone — or “spousal relationship” in separation agreements in an attempt to avoid the reach of Northrup v Northrup.[22] The New York courts, from the Court of Appeals on down, have been strict in requiring substantial *730 proof of compliance with such contractual terms before enforcing such clauses. (See e.g. Fecteau v Fecteau, 97 AD3d 999, 1000 [3d Dept 2012] [no “spousal relationship” found even if couple lived together for two years, ex-spouse paid no utilities or rent during the cohabitation, borrowed money from the friend, shared household chores, had a “romantic relationship” and named the friend as recipient of her life insurance policy].)
Nonetheless, in analyzing these relationships in the twenty-first century, the Court of Appeals has signaled a shift away from “morality” — the shared bedroom and sexual relationship — to a more realistic and more provable “shared economic unit” in defining the “intimate relationships” that allow a payor spouse to discontinue paying maintenance. This shift in thinking is manifest by the Court of Appeals in Graev v Graev (11 NY3d 262 [2008]). Graev was not decided under Domestic Relations Law § 248. The sole issue was the interpretation of the term “cohabitation” in a separation agreement. But the tussle between the four-member majority and three-member dissenting opinion involved whether evidence of “economic interdependence” was relevant in deciding whether cohabitation occurred. The ex-wife argued that cohabitation did not occur because the friend was economically independent. He owned and lived significant time in his own house and did not contribute to the ex-wife’s housing or other personal costs. The majority held that “cohabitation” was the equivalent of “living together,” and it was unclear whether that meant that the ex-spouse’s economic life was intertwined with the friend. In reaching this conclusion, the Court majority acknowledged that several Appellate Division decisions had equated cohabitation to “changed economic circumstances.” (Graev at 272; Matter of Ciardullo v Ciardullo, 27 AD3d 735 [2d Dept 2006]; Clark v Clark, 33 AD3d 836 [2d Dept 2006].) The majority even admitted that its own precedents — a one-line affirmance of Scharnweber v Scharnweber (65 NY2d 1016 [1985]) — may have contributed to that mistaken assumption by the Appellate Divisions. The majority corrected this mistaken assumption: “While more recent Appellate Division decisions — particularly Ciardullo and Clark— *731 may be read to imply, as the Appellate Division held in this case, that there can be no ‘cohabitation’ without changed economic circumstances, we have never taken this position and decline to do so now.” (Graev at 273.) While the majority declined to expand their holding, nonetheless, four Court of Appeals Judges concluded that functioning as “an economic unit” or “changed economic circumstances” could be factors in resolving whether cohabitation existed.
Importantly, the dissent strongly disagreed with the majority’s attempt to wash over its holding. Justice Graffeo, writing for the dissenters, held:
“The essential holding of the majority’s Opinion is that there can be cohabitation without financial interdependence or functioning as an economic unit (see majority op at 273 [recognizing the existence of the Appellate Divisions’ ‘economic unit’ theory but stating that ‘we have never taken this position and decline to do so’ in this case]).” (Id. at 279 n 3 [Graffeo, J., dissenting].)
Justice Graffeo then described the factors that would lead to a finding of cohabitation:
“[C]ohabitation is comprised of several distinct elements: (1) living with (2) an unrelated adult (3) for a specified period of time or with an expectation of permanence (4) in an intimate relationship (5) without being married to that person. In my view, the extent to which a couple intermingles its finances is pertinent on the issues of whether the relationship is sufficiently ‘intimate’ or whether the parties intended a long-term commitment.” (Id.)
Justice Graffeo then adds, as a final comment, a sentence that echoes the letter written by the Assembly Sponsor of the precursor to section 248 to Governor Lehman in 1938, and, suggests that this debate over when maintenance can terminate has come full circle. She writes: “these [cohabitation] clauses may also be designed to prevent an ex-spouse from using the money he or she receives from an ex-spouse to support a new paramour.” (Id. at 280.) The Judge then adds as a footnote, references to three cases from other states that reiterate the point Assemblyman Moran made in the letter to Governor Lehman in support of section 248 as it existed in 1938: it is not fair that *732 maintenance should be paid to subsidize a former spouse’s friend. (Id. at 280 n 4.)[23]
In this court’s view, what Graev v Graev tells this court is that while the seven justices could not agree on whether “economic interdependence” was essential to defining the word “cohabitation,” all seven acknowledged that economic factors in the life of the recipient of maintenance could be a factor in deciding whether a couple were “living together.” The decision in Graev, which allows consideration of economic factors in resolving whether maintenance should be modified under a “cohabitation” clause, is consistent with the economic models used by the legislature in directing whether maintenance should be paid or modified in the post-1980 amendments to the Domestic Relations Law.
The language of section 248 — “living with” and “holding out” — is not discussed in Graev. But, the economic factors, cited by the dissent in Graev to decide “cohabitation,” should be the same factors under which an analysis of the term “holding out” in section 248 should be conducted. If a couple share expenses and costs, share cars, share a checking account, buy and share the cost of groceries for the same household, and travel together, they are functioning as a single economic unit. Any third party, observing their shared financial lives, would conclude that they are an “economic unit.” When their economic life is shared and observed by all outsiders and their intimate life is similarly shared — and known to all outsiders who observe them living in the same household and they acknowledge it — they are “holding themselves out” as a single family unit and the equivalent of husband and wife. Recent New York court decisions are moving in the same direction. (Vega v Papaleo, 119 AD3d 1139, 1140 [3d Dept 2014] [following Graev v Graev, the Court held that while no single factor— such as residing at the same address, functioning as a single economic unit, or involvement in a romantic or sexual relation *733 ship — is determinative in deciding cohabitation, the Court further found that a “common element” in the various dictionary definitions is that they refer to people living together “in a relationship or manner resembling or suggestive of marriage”]; Joseph M. v Lauren J., 45 Misc 3d 1211 [A], 2014 NY Slip Op 51536[U], *5 [Sup Ct, NY County 2014] [under the circumstance presented, where the parties have been separated for an extended period of time, and where the payee spouse relied on a new relationship for her support rather than taking steps to become self-supporting, it is highly doubtful that the court, “in its sound discretion,” would see fit to make a significant final maintenance award].)
11. The Amendments to the Domestic Relations Law Emphasize the Importance of Economics in Awarding Maintenance
In considering the question before this court, a final analysis is required before applying the holdings of the Court of Appeals and Domestic Relations Law § 248 to this case. In this court’s view, the legislature, while changing the context and concept of maintenance since Northrup v Northrup, has modified the circumstantial evidence that can be considered by the courts in evaluating whether an ex-spouse is holding themselves out as another’s spouse. Prior to 1980, the Domestic Relations Law provided that a court had the discretion to direct the husband to provide suitably for the support of the wife as justice requires, considering the length of the marriage, the ability of the wife to be self-supporting, the circumstances of the case, and of the respective parties. (Domestic Relations Law § 236.) In Hall v Hall, the court remarked on how the changes in the Domestic Relations Law moved the court closer to the concept of marriage — and the circumstances of its dissolution — as involving economic rights and realties. (Matter of Hall v Hall, 82 Misc 2d 814 [Fam Ct, Schenectady County 1975].) In 1980, the legislature amended the Domestic Relations Law to provide for an award of maintenance to “meet the reasonable needs of a party” to a matrimonial action.[24] The legislative objective of the 1980 maintenance changes was to provide the recipient spouse with an opportunity to achieve in *734 dependence following divorce by providing for support payments payable at fixed intervals for a definite or indefinite period of time. The legislature stated that a maintenance award should reflect “such amount as justice requires, having regard for the circumstances of the case and of the requisite parties.” (See generally David Kaufman, The New York Equitable Distribution Statute: An Update, 53 Brooklyn L Rev 845, 855 [1987].)
Six years later, the legislature again changed the maintenance provisions. The 1986 amendment altered the prior law by removing the pre-divorce standard of living from a lengthy list of enumerated factors, and according it separate priority within the primary structure of Domestic Relations Law § 236 (B) (6) (a). (Hartog v Hartog, 85 NY2d 36, 51 [1995].) Legislative history makes clear that the purpose of the 1986 amendment was to “require the court to consider the marital standard of living” in making maintenance awards. (Id. [emphasis and brackets omitted].) Subsequent court decisions followed Hartog’s reasoning. “[T]he overriding purpose of a maintenance award is to give the spouse economic independence.” (Cohen v Cohen, 120 AD3d 1060, 1065 [1st Dept 2014].) Domestic Relations Law § 236 provides 20 separate factors for the court to consider when determining maintenance. One of the factors is Domestic Relations Law § 236 (B) (6) (a) (8), which states that a court must consider: “the ability of the party seeking maintenance to become self-supporting and, if applicable, the period of time and training necessary therefor.” (See e.g. Burns v Burns, 70 AD3d 1501, 1503 [4th Dept 2010] [holding that the court properly considered the statutory maintenance factors, including the fact that plaintiff is self-supporting and has the capacity to increase her earnings in the future, and that the “court’s maintenance award reflects an appropriate balancing of plaintiff’s needs and defendant’s ability to pay” (internal quotation marks omitted)]; Quinn v Quinn, 61 AD3d 1067, 1071 [3d Dept 2009] [stating that “(m)aintenance is designed to provide temporary support while one spouse gains skills, education or experience necessary to become self-sufficient”].) These amendments reflect a recognition by the legislature that “economic factors” — the standard of living and “independence” — should be the critical factors in any award of maintenance. However, the legislature did not amend section 248 which seemingly sets a noneconomic standard — “holding *735 out” — as the critical factor in deciding whether maintenance payments can be modified in the discretion of the court. In short, the legislature, by amending section 236, while keeping section 248 in tact, was projecting a “Janus-like” profile to the courts: on the one hand, “economic factors” (the right to financial independence and a comparable standard of living) should govern the allocation of maintenance in the first instance, but once awarded, maintenance could only be modified when “noneconomic factors” (“cohabitation” and “holding out”) were proved.
A final legislative change impacts this court’s analysis. Domestic Relations Law § 236 (B) (9) (b) (1), which allows changes in maintenance under either an agreement or a court order, is entirely economic based: the “change in circumstances” is either based on changes in the payor’s financial circumstances or “extreme financial hardship” to either party. (Matter of Boatman v Boatman, 113 AD3d 951 [3d Dept 2014] [to justify changes there must be proof of a change to their current financial circumstances]; Capozzoli v Capozzoli, 81 AD3d 584 [2d Dept 2011].) These post -Northrup statutory changes, considered as a package, are bright evidence that the legislature, in conceiving how and when support to an ex-spouse should be paid, is no longer concerned about moral conduct, “the reputation of a wife,” appearances, or community reputation. Under the current statute, economic factors — the ability to pay, the need for the recipient’s economic independence — are the touchstones for paying, modifying or terminating support by one’s spouse to another.[25] These changes were enacted in large measure to permit the recipient to achieve some economic independence as they started a new life. In addition, when the temporary maintenance guidelines were enacted in 2010, no changes were made to section 248, even though the guidelines set forth a series of economic factors for the court’s consideration when imposing temporary maintenance. (Domestic Relations Law § 236 [B] [5-a] [c] [1].) Under the temporary *736 guidelines, the only salient factor, in calculating the amount of maintenance, is the income of the parties, a fact that further reinforces the concept that the legislature sees maintenance as an economic transfer payment that allows a lesser-moneyed spouse to achieve economic independence. (Joseph M. v Lauren J., 45 Misc 3d 1211 [A], 2014 NY Slip Op 51536[U] [Sup Ct, NY County 2014].)
12. Conclusion
If this court strictly reads Northrup v Northrup and its successors, then it will never be able to attain the equitable power that the legislature intended to provide the judiciary. In this court’s view, the Court of Appeals decision in Northrup must be revisited under the “economic based” rationale for maintenance infused in the amendments to the Domestic Relations Law since 1980. Under these revisions, the legislature, while leaving the language of section 248 in place and the interpretation by the Court of Appeals in Northrup v Northrup undisturbed, clarified the purpose of maintenance. Domestic Relations Law § 236 (B) (6) (a) (8) states that a court must consider, “the ability of the party seeking maintenance to become self-supporting and, if applicable, the period of time and training necessary therefor.” The courts have repeatedly echoed the importance of maintenance to divorced spouses. “[T]he overriding purpose of a maintenance award is to give the spouse economic independence.” (Cohen v Cohen, 120 AD3d 1060, 1065 [1st Dept 2014].) Maintenance is equated with self-support. (Gordon v Gordon, 113 AD3d 654 [2d Dept 2014]; Schmitt v Schmitt, 107 AD3d 1529 [4th Dept 2013]; Burns v Burns, 70 AD3d 1501, 1503 [4th Dept 2010] [holding that the court properly considered the statutory maintenance factors, including the fact that plaintiff is self-supporting and has the capacity to increase her earnings in the future, and that the “court’s maintenance award reflects an appropriate balancing of plaintiff’s needs and defendant’s ability to pay” (internal quotation marks omitted)]; Quinn v Quinn, 61 AD3d 1067, 1071 [3d Dept 2009] [stating that “(m)aintenance is designed to provide temporary support while one spouse gains skills, education or experience necessary to become self-sufficient”].) Because this goal — economic independence or self-support — is the purpose of maintenance, this court has routinely devised maintenance orders to achieve that goal with the understanding that the recipient will need the additional financial resources to be self-supporting, without the *737 participation of any other person. In this light, the financial transfer is necessary to make the recipient able to live independently in a fashion that somehow equates with the style of living during the marriage. This court recognizes that goal as purely aspirational: often when a couple separate and need to support two residences, the family income is stretched to a breaking point and each spouse faces a drastically altered style of living. But the legislative goal in requiring payment of maintenance is to assure that the recipient, lesser-monied spouse, has the choice to live independently, without seeking support from any other individual. No spouse, either while a divorce is pending or thereafter, should have to forfeit their ability to live independently, if their current or former spouse can afford to provide them supportive financial assistance.
But, conversely, if a spouse elects to share accommodations, finances and a family environment in a virtual marital state with another person, the recipient is no longer living “economically independent” or “self-supporting.” Instead, he or she is obtaining support from the person with whom the party cohabitates and the recipient’s need for support could be substantially diminished. In those circumstances, the payor spouse can, rightly, consider the maintenance payments as supplementing the lifestyle not only of his or her former spouse, but the former spouse’s friend. In essence, the payor is not supporting an “independent spouse,” but instead supporting a spouse who, as a result of sharing expenses and costs, is now dependent on or interdependent with a cohabitor.
There must be a series of facts — exclusive of a declaration by the recipient of their spouse-like status — that would justify the circumstantial conclusion that a recipient of maintenance is holding themselves out as the economic equivalent of a spouse. In 2015, the facts of shared intra-couple economy — shared residences, a shared bedroom, shared bank accounts, shared child responsibilities, shared travel, shared activities, shared socializing — are the equivalent of “holding out” as a married couple. Seen from the streetscape, anyone looking at the recipient and her friend on these facts would conclude that they were married: they do everything that a married couple would do.
In reaching any conclusion, this court must abide by the strictures of both section 248 and the Court of Appeals holding in Northrup v Northrup. In considering its options, this court does not tinker with either the legislative directive or the Court *738 of Appeals interpretation of it. But, what has evolved since both the enactment of section 248 and the decision in Northrup v Northrup is the legislature’s concept of maintenance as an extension of the economic partnership in a marriage. The Court of Appeals recognized it: the fundamental purpose of the Equitable Distribution Law was the recognition of marriage as an economic partnership. (Fields v Fields, 15 NY3d 158, 162 [2010].) The entire basis for the Equitable Distribution Law derives from the concept that marriage is an economic partnership and it is no longer tied to any moral behavior by a former spouse. (Ceravolo v DeSantis, 125 AD3d 113 [3d Dept 2015]; Gately v Gately, 113 AD3d 1093, 1093 [4th Dept 2014] [“economic partnership” concept of the marriage relationship].) Under this view of marriage, the concept of maintenance in the Domestic Relations Law follows the same “economic” rules and has been transformed by legislative command into a tool of economic transfer to allow a former spouse to live economically independently and maintain a “marriage comparable” lifestyle. When a former spouse lives in a marriage-like relationship with another and they “hold themselves out” as an “economic unit” and a recipient spouse “hold’s herself out” as economically intertwined with another, the underlying purpose of a maintenance payment by the former spouse is undercut. When a former spouse holds herself out as “economic interdependent” as though he or she were a spouse, a court, pursuant to Domestic Relations Law § 248 and the changes in the legislative commands regarding the economics of marriage during the last three decades, has the power to modify or terminate the maintenance.
In this case, the evidence at trial establishes that the ex-spouse has been cohabitating and holding herself out as “the economic partner” of another male. She shares a bedroom with her “economic partner,” shares household expenses, chores, a bank account, and designates the cohabitating partner as an emergency contact for a six-year-old child. She has established an “economic partnership” with another, holding herself out as an “economic partner” of her friend. This assertive conduct, cast in economic terms, as the legislature has modeled, is sufficient for this court to exercise its discretion to consider modification or termination of maintenance.
Having determined that this court has the discretion under Domestic Relations Law § 248, the burden shifts to the wife to establish the basis for any future payments of maintenance. *739 The burden of proof requires that the wife show a need for maintenance by showing proof of necessity or the inability to maintain herself. (Wing v Wing, 57 AD3d 535 [2d Dept 2008].) There was no proof during this trial to substantiate any such claim by the wife. However, this court notes that the result reached in this decision, as it applies the new legislatively-sanctioned economic-based theory to the Court of Appeals decision in Northrup v Northrup, was not anticipated by the litigants during the trial of this matter. Because this decision alters the landscape of section 248, this court, in the exercise of the statutory discretion, will permit the recipient to reopen the proof and present evidence that the continuation of maintenance is necessary to maintain independence for herself under the current conditions. The maintenance is suspended, pending the outcome of that hearing and if the wife fails to meet her burden of proof, the maintenance will be terminated retroactive to the date of the filing of the petition, consistent with this opinion.

. During this proceeding, the husband, representing himself, never suggested that the maintenance could be modified other than by application of Domestic Relations Law § 248. The parties argued that section 248 controlled the disposition of this application and the court accepts that posture for purposes of this opinion.

. Domestic Relations Law § 248 was originally enacted in 1938 as Civil Practice Act § 1159 (L 1938, ch 161, § 1). It was later renumbered as Civil Practice Act § 1172-c in 1940 with the requirement that the action be brought by the wife deleted. (L 1940, ch 226, § 10.) The 1940 version of the law was recodified without change as Domestic Relations Law § 248 in 1962. (L 1962, ch 313, § 10.) Finally, in 1975, section 248 was modified to its present state to remove the requirement that a final judgment of divorce “has been rendered in favor of the wife.” (L 1975, ch 604, § 1.)

. The Court of Appeals opinion in Hayes v Hayes was a simple affirmance, without opinion (220 NY 596 [1917]). The Appellate Division opinion below was a single sentence affirmance. (Hayes v Hayes, 175 App Div 941 [2d Dept 1916].) It appears that neither Court gave serious thought to the implications of the holding.

. “Cohabitation and reputation, or the holding out of one another to the world as husband and wife, do not establish a common-law marriage, although they constitute evidence of such a marriage.” (Stern v Stern, 88 Misc 2d 860, 863 [Sup Ct, Nassau County 1976].)

. There is an argument, reviewed in Citron v Citron, but ultimately rejected both by the trial court in that case and later by the Court of Appeals, that Domestic Relations Law § 248 was designed to enable a court to modify maintenance on the basis of fundamental fairness. Assemblyman Moran sponsored the bill and he wrote a two-page letter to then Governor Lehman dated March 24, 1938 that stated:
“This bill overcomes a racket wherein ‘A, a beautiful young blond, married ‘B’, rich old fool and so conducts herself so that within three months ‘B’ is most anxious and very agreeable to a divorce and the payment of $200.00 weekly alimony. ‘A who is very fond of ‘C’ also young, wants to marry him but realizes that marriage will deprive her of the $200.00 per week. Instead of marrying ‘C’, she lives with him habitually as Mrs. C, and holds herself out as such. Thus both ‘A and ‘C’ live happily ever after on ‘B’ ’s $200 per week. It is not fair.” (Citron v Citron, 91 Misc 2d at 791.)

. See discussion in Citron v Citron, 91 Misc 2d at 788-791.

. The Waddey case highlights another inequity in divorce litigation. The wife was destitute, according to her brief to the courts, and could not afford to duplicate the referee’s opinion in the record on appeal. In a world without copying machines, the cost would have been prohibitive. There was no statutory requirement for payment of fees to the lesser moneyed spouse. (See Domestic Relations Law § 237 [a] [presumptive fees to the less moneyed spouse].) As a result, despite a search through the record, this court could not find a copy of the referee’s report. This report is the first instance— shortly after the statute was passed — in which a court official, with approval of a trial judge, considered the quantum of proof necessary to meet the “holding out” standard.

. The Court of Appeals majority opinion in Blek v Blek is only three paragraphs long. The Appellate Division, Second Department, affirmed the trial court in a one-sentence opinion, indicating that the “holding out” was determined by a jury. (Blek v Blek, 281 App Div 692 [2d Dept 1952].)

. See Gleason v Gleason, 26 NY2d 28 (1970) (discussion of 1966 amendments to the Domestic Relations Law).

. In another pre-Northrup case, Stern v Stern (88 Misc 2d 860 [Sup Ct, Nassau County 1976]), sharing the cost of dining out was not sufficient to constitute holding out. The fact that another man may have contributed, at times, toward the expenses of the divorced wife in connection with dining out or entertainment, even when taken together with other proof showing that they lived together, was not sufficient.

. A quick computer search shows that this Illinois case has been cited twice by the New York Court of Appeals (in Northrup v Northrup and Bliss v Bliss, 66 NY2d 382 [1985]), but only once in Illinois, and never for the "holding out” proposition. In Illinois, the courts, over time, set a less rigorous test for the discretionary modification of maintenance. The burden is on the party seeking the termination of maintenance to prove that the ex-spouse receiving maintenance is involved in a de facto husband and wife relationship with a third party. (In re Marriage of Lambdin, 245 Ill App 3d 797, 613 NE2d 1381 [1993].) In determining whether that burden has been met, courts look to the totality of the circumstances and consider the following factors: “(1) the length of the relationship; (2) the amount of time the couple spends together; (3) the nature of activities engaged in; (4) the interrelation of their personal affairs; (5) whether they vacation together; and (6) whether they spend holidays together.” (In re Marriage of Sunday, 354 Ill App 3d 184, 189, 820 NE2d 636, 640 [2004].)

. In the cell phone era, a more relevant question would be whether an ex-spouse and the friend share a cell phone billing account, but even if proved, that fact would be a private one, unknown to the general public and not a part of the couple’s public reputation.

. Former Second Department, Appellate Division Justice Moses Weinstein penned an identical critique to this proof requirement in Northrup v Northrup, commenting on two occasions almost 30 years ago:
“The social climate today, as contrasted with that prevailing in 1962 when Domestic Relations Law § 248 was enacted, has undergone notable changes. As noted in a recent decision of the Family Court, Westchester County (Nanette M. v Gerald S. M., NYLJ, Mar. 6, 1986, at 18, cols 2, 4): ‘Modern differences are obvious. Today, married women frequently prefer to retain their maiden names for professional or other reasons. Telephone listings create little inference as to marital status. It is often difficult to ascertain the marital status of men or women by name or observation of their living arrangements. Unmarried couples living together are largely accepted socially and professionally without question or comment.’ ” (Lefkon v Drubin, 143 AD2d 400, 401 [2d Dept 1988, Weinstein, J., dissenting]; Brown v Brown, 122 AD2d 762 [2d Dept 1986].)
Whatever anyone may think about Judge Weinstein’s observation of “notable changes,” everyone would agree that the changes he described are commonplace in 2015. He knew something about legislative changes as well, *723 having served as the majority leader of the New York State Assembly for three years.

. After Lang v Superior Court, California changed its legislation to permit modification of maintenance when cohabitation occurs and then eventually made changes to the California Family Code to create a rebut-table presumption, affecting the burden of proof, of decreased need for spousal support if the supported party is cohabiting with a nonmarital partner. Upon a determination that circumstances have changed, the court may modify or terminate the spousal support. (Cal Fam Code § 4323.) Once the supporting spouse establishes cohabitation, the burden shifts to the supported spouse to overcome the presumption that her need for support has decreased. (In re Marriage of Denney, 115 Cal App 3d 543, 171 Cal Rptr 440 [1981].)

. The legislature has attempted to remove the requirement of holding herself out since the Northrup decision, but the amendments have failed to pass. (See 1978 NY Legis Rec and Index, Senate Intro No. 7144, Assembly Intro No. 11474; 1985 Senate Intro No. 769, 1985 Assembly Intro No. 1824.)

. What is curious in reviewing this comment from the Court is that while the Court suggests there is other proof that would justify a finding of “holding out,” the Court itself cannot seem to find — or recite — any. For example, if a couple signs a lease as husband and wife, the only person to whom they would be “holding out” is the landlord. According to the Court in Bliss v Bliss that proof might meet the test; the testimony of the next-door neighbor, who observes them daily, acting as a married couple, does not meet the test.

. The Court’s suggestion that maintaining a prior married name was evidence that she “never held herself out” seems quaint as a criterion when currently many women retain their maiden name upon marriage, and many retain their married name after their divorce.

. These facts, as utilized by the Court, suggest an even more strained notion of “holding out.” If someone “holds themself out” to their bank and insurance carrier in a private transaction as a single person, the Court is stripped of its discretion to modify maintenance even if the same person “holds themself out” to everyone in their apartment building, and their friends and family, as a married couple.

. A thought: if Judge Levine and Judge Rosenblatt — the former who thought section 248 should give trial judges discretion to size up post-divorce relationships and alter maintenance accordingly and the latter who quoted Judge Wachtler’s dissent in Northrup and articulated that section 248 was designed to “prevent a paramour from living on the support provided by the payor spouse” — had been on the Court in 1978, the Northrup dissent might have been its majority opinion.

. Paul S. v Roberta S., cited by the Court of Appeals in Bliss v Bliss, has only once been cited by another New York court in 40 years.

. In the only two post -Northrup cases where “holding out” is found, it is telling that not only is there trickery, but also fabrication — the ex-spouse lies about her new partner when calling him her husband. When viewed in this light, it appears that “holding out” is only proved when the ex-spouse lies and tells others that she is married when she is not. It seems incongruous that the state legislature only intended to cut off maintenance if the recipient lied to the public.

. A recent Fourth Department decision allows a court to order upon the initial award of maintenance that the maintenance will terminate upon the wife residing with an unrelated male for 30 days. (Juhasz v Juhasz, 59 AD3d 1023 [4th Dept 2009].) This decision indicates that courts in awards of main *730 tenance can change the test for termination from the strictures of section 248 to simply cohabitation for a set period, a tacit acknowledgment that the economic model of interdependence should govern continued payment of maintenance and that courts have the discretion to create a “fair and equitable maintenance award.” (Hartog v Hartog, 85 NY2d 36, 52 [1995].)

. Gordon v Gordon, 342 Md 294, 309-310, 675 A2d 540, 548 (1996) (“if the cohabitant does not pay a fair share of the household expenses, then it follows that part of the support payment supports the cohabitant rather than the ex-spouse”); Wolfe v Wolfe, 46 Ohio St 2d 399, 421, 350 NE2d 413, 427 (1976) (“ ‘if the paramour resides in the wife’s home without contributing anything toward the purchase of food or the payment of normal household bills, then there may be a reasonable inference that the wife’s alimony is being used, at least in part, for the benefit of the paramour, in which case it could be argued with force that the amount thereof should be modified accordingly’ ”), quoting Garlinger v Garlinger, 137 NJ Super 56, 64, 347 A2d 799, 803 (1975).

. The New York State Assembly’s Memorandum in Support of Equitable Distribution Bill provides further insight into the intent and justification of maintenance: “The objective of the maintenance provision is to award *734 the recipient spouse an opportunity to achieve independence.” (Assembly Mem in Support, Bill Jacket, L 1980, ch 281, § 9, eff July 19, 1980.)

. New York’s neighboring states use a similar economic model for evaluating whether maintenance should be paid and whether it can be terminated. Connecticut uses a “economic unit” model. (Conn Gen Stat § 46b-86 [b] [“the Superior court may . . . suspend, reduce or terminate the payment of periodic alimony upon a showing that the . . . living arrangements cause such a change of circumstances as to alter the financial needs of that party”].) Massachusetts uses a common household model, employing the same criteria that are used in evaluating the “economic unit” model. (Mass Gen Laws, ch 208, § 49 [d].)